# Court of Appeals.

*October,* 1889.

(Affirming 6 *N. Y. Crim. Rep.* 57.)

PEOPLE *v.* BUDD.

PEOPLE *ex rel.* ANNAN *v.* WALSH.

PEOPLE *ex rel.* PINTO *v.* WALSH.

CONSTITUTIONAL LAW.—" GRAIN ELEVATOR ACT," L. 1888, CH. 581.

The statute, Laws of 1888, chapter 581,—fixing a maximum charge for elevating grain,—is valid and constitutional.

The provision of the statute (section 1) restricting to the actual cost the charge for trimming and shoveling to the leg of the elevator, in the process of handling grain, which vessels are required to pay, was intended to exclude any charge by the elevator beyond the sum specified for the use of its machinery in shoveling, and the ordinary items of operating it, and the outside labor required for bringing the grain to the leg of the elevator.

The elevator owners can not separate the charges for the various parts of the same service,—the charge for the use of the steam shovel furnished by them for elevating the grain, and the sum which may be agreed upon between them and the laborers who shovel the grain to the leg of the elevator,—and thereby, under cover of payment for the use of the steam-shovel, exact of the carrier a sum for elevating grain beyond the rate fixed by the act.

Only when required by cogent reasons, or when compelled thereto upon unanswerable grounds, will a court declare a statute unconstitutional.

A statute does not deprive the citizen of his liberty or property, in a constitutional sense, simply because it abridges freedom of action, or regulates occupations, or subjects individual property to restraints in matters indifferent, except as they affect public interests, or the rights of others.

Regulation, under the police power, infringes the constitutional

guaranty only when it is extended to subjects not within its scope and purview, as that power was understood when the Constitution was adopted.

While the uses to which a man may devote his property, the price which he may charge for such use, how much he may demand or receive for his labor, and the method of conducting his business, are, as a general rule, not the subject of legislative regulation ; nevertheless, when an employment becomes a matter of such public interest and importance as to create a common charge or burden upon the citizen ; in other words, when it becomes a virtual monopoly to which a citizen is compelled to resort, and by means of which a tribute can be exacted from the community, it is the subject of regulation by legislative power.

In the power of legislative exercise the court has nothing to do with the policy or wisdom of interference in a particular case, or with the adequacy or inadequacy of the compensation authorized.

The power of the legislature to control and regulate elevator charges rests upon the nature and extent of the business, the existence of a virtual monopoly, the benefit derived from the canal, which is kept a free highway at the expense of the State, and which creates the business of elevating and renders it profitable; the interest to trade or commerce, the relation of the business to the prosperity and welfare of the State, and the practice of legislation in analogous cases.    These collectively create an exceptional case and justify legislative regulation.

The joinder of several misdemeanors in the same indictment is not a cause for reversal of the judgment where there is a general verdict of guilty, and the sentence is single and appropriate to each of the misdemeanors upon which the conviction was had.

Appeal by defendant, J. Tallman Budd, from a judgment of the General Term of the Superior Court of Buffalo of January 2, 1889, affirming a judgment of the criminal branch of that court of November 29, 1888, Hon. Rupert C. Titus, presiding, entered upon a conviction of the defendant of a violation of the provisions of the Grain Elevator Act (Laws 1888, chap. 581).

Appeal by Edward Annan, relator, from an order of the General Term of the Supreme Court in the Second Department, of October 2, 1888, dismissing writs of *habeas corpus* te bring up the person of, and certiorari to inquire

the cause of the detention of, relator held in default of bail by Andrew Walsh, Police Justice in the City of Brooklyn, for a violation of the " Grain Elevator Act," offered to above.

An appeal was also taken by the relaior Francis E. Pinto from a similar order of the same General Term. The cases of Annan and Pinto were heard and decided together.

The facts and the briefs of counsel in the Annan and Pinto cases are given in the report of the decision of the General Term of the Supreme Court at 6 *N. Y. Crim. Rep.* 57.

In the Court of Appeals the three cases were argued and decided together.

*Spencer Clinton,* for defendant appellant, J. Tallman Budd.

*Charles F. Tabor,* Attorney-General, and *George D. Quinby,* District Attorney of Erie County, for the people, respondents, in People *v.* Budd.

*Wm. N. Dykman,* for relators appellants, Annan and Pinto.

*Charles F. Tabor,* Attorney-General, *James D. Ridgway,* District Attorney of Kings County, and *J. A. Hyland,* for the people, respondents, in the case of Annan and Pinto.

In the case of People *v.* Budd, the Court of Appeals delivered the following opinion :

ANDREWS, J.—The main question upon this record is whether the legislation fixing the maximum charge for elevating grain, contained in the act, chapter 581 of the Laws of 1888, is valid and constitutional. The act, in its first section, fixes the maximum charge for receiving,

weighing and discharging grain by means of floating and stationary elevators and warehouses in this State, at five-eighths of 1 cent a bushel, and for trimming and shoveling to the leg of the elevator in the process of handling grain by means of elevators. "Lake vessels or propellers, the ocean vessels or steamships, and canal-boats" shall, the section declares, only be required to pay the actual cost. The second section makes a violation of the act a misdemeanor, punishable by a fine of not less than $250. The third section gives a civil remedy to a party injured by a violation of the act. The fourth section excludes from the operation of the act any village, town or city having less than 130,000 population. The defendant, the manager of a stationary elevator in the City of Buffalo, on September 19, 1888, exacted from the Lehigh Valley Transportation Company for elevating, raising and discharging a cargo of corn from a lake propeller at his elevator the sum of 1 cent a bushel, and for shoveling to the leg of the elevator the carrier was charged and compelled to pay $4 for each thousand bushels. The shoveling of grain to the leg of an elevator at the port of Buffalo is now performed pursuant to an arrangement made since the passage of the Act of 1888 by a body of men known as the Shovelers' Union, who pay the elevator $1.75 a thousand bushels for the use of the steam shovel, a part of the machinery connected with the elevator, operated by steam, and who for their services and the expense of the steam shovel charge the carrier for each thousand bushels of grain shoveled the sum of four dollars.

The defendant was indicted for a violation of the Act of 1888. The indictment contains a single count charging a violation of the first section in two particulars, viz.: In exacting more than the statute rate for elevating the cargo, and exacting more than the actual cost for shoveling the grain to the leg of the elevator. Before reaching the main question there is a subordinate question to be considered. The defendant on the trial raised the question of the constitutionality of the Act of 1888, and also insisted, as to the

People *v.* Budd.

alleged overcharge for shoveling, the facts did not show that the defendant had received anything for that service, or that the cargo had been charged more than the actual cost, and excepted to the submission to the jury of that branch of the case. The trial judge overruled both points and submitted the case to the jury in both aspects, who found a general verdict of guilty, and thereupon the court imposed upon the defendant a fine of $250. It is now urged that, assuming the constitutionality of the Act of 1888, the judgment should be reversed, for the reason that no overcharge by the defendant for shoveling was proved, and also that the sum paid for shoveling was paid to the Shovelers' Union, the defendant only receiving thereout from the union the rent agreed for the use of the steam shovel.

There are two answers to this proposition. The words "actual cost," used in the statute, were manifestly intended to exclude any charge by the elevator beyond the sum specified for the use of its machinery in shoveling, and the ordinary expenses of operating it, and to confine the charge to the actual cost of the outside labor required for trimming and bringing the grain to the leg of the elevator. The purpose of the act could be easily evaded and defeated if the elevator owners were permitted to separate the services, and charge for the use of the steam shovel any sum which might be agreed upon between themselves and the Shovelers' Union, and thereby, under cover of charging for the use of the steam shovel, exact of the carrier a sum for elevating beyond the rate fixed by the act.

There is a second answer to the proposition. It was undisputed that the defendant exacted a greater charge for elevating than the sum allowed by the act. This was proven by testimony on the part both of the prosecution and the defendant. The verdict of guilty was followed by infliction of the lowest penalty for a single offense. The verdict and sentence were justified without considering whether an offense was made out under the second allega-

tion in the indictment. No question as to the form of the indictment was made. The joinder of several distinct misdemeanors in the same indictment is not a cause for the reversal of the judgment where there is a general verdict and the sentence is single and is appropriate to either of the counts upon which the conviction was had. Polinsky *v.* People, 73 *N. Y.* 65. Even if the alleged overcharge for shoveling was not made out, the verdict and sentence are supported by the findings of the jury on the other branch of the case, and the refusal of the judge to withdraw from the jury the consideration of the question, whether there was an overcharge for shoveling, could not prejudice the defendant.

Passing, therefore, this point, we come to the main question, and that is, whether legislative power under the State Constitution exists in the Legislature to prescribe a maximum charge for elevating grain by stationary elevators owned by individuals or corporations who have appropriated their property to this use and are engaged in this business.

The ascertainment of the exact boundaries of legislative power under the rigid constitutional system of the American States is in many cases attended with great perplexity and difficulty. The people have set into the frame-work of the Constitution a variety of restrictions upon legislative power, and chief among them is that which ordains that no person shall be deprived of life, liberty, or property without due process of law. There is but little difficulty in determining the validity of a statute under this constitutional principle in cases where the statute assumes to divest the owner of property of his title and possession, or to actually deprive him of his personal liberty. The State may lawfully take the property or life of the citizen without infringement of the constitutional guaranty. The cases where the right of property is set aside by positive laws are various. Distress, executions, forfeitures, taxes, are of this description, " wherein," said Lord Camden, in Entick *v.* Carrington (19 *How. St. Tr.* 1,066), " every man by common consent gives

up that right for the sake of justice and the common good." The State may directly take private property for public use on the condition of making compensation, and the cases where it may be taken in satisfaction of public and private obligations, or for the support of government, or as a return for governmental protection, are determined by general rules well understood and easily applied. The difficulty in the application of the constitutional principle arises in the main in respect to that class of legislation, not infrequent, which, while it does not in a strict sense deprive an individual of his property or liberty, does, nevertheless, in many cases, by the imposition of burdens and restrictions upon the use and enjoyment of property, and by restraints put upon personal conduct, seriously impair the value of property and abridge freedom of action. The validity of legislation of this kind to some extent and within certain limits is questioned by none. But such legislation may overpass the boundaries of legislative power and violate the constitutional guaranty, for it is now an established principle that this guaranty protects property and liberty not merely from confiscation or destruction by legislative edicts, but also from an essential impairment or abridgement not justified by the principles of free government. This court has recently, in several notable instances, vindicated the rights of individuals against unjust and arbitrary legislation, restraining freedom of action or imposing conditions upon private business, not warranted by the Constitution. *In re* Jacobs, 98 *N. Y.* 98; 2 *N. Y. Crim. Rep.* 539; People *v.* Marx, 99 *N. Y.* 377; 3 *N. Y. Crim. Rep.* 200; People *v.* Gillson, 109 *N. Y.* 399.

But the very existence of government presupposes the right of the sovereign power to prescribe regulations demanded by the general welfare for the common protection of all. This principal inheres in the very nature of the social compact. The protection of private property is one of the main purposes of government, but no one holds his property by such an absolute tenure as to be freed from the

power of the Legislature to impose restraints and burdens required by the public good, or proper and necessary to secure the equal rights of all. This power of government, the power, as expressed by TANEY, Ch. J. (License Cases, 5 *How.* 583), "inherent in every sovereignty, the power to govern men and things," is not, however, an uncontrollable or despotic authority, subject to no limitations, exercisable with or without reason in the discretion or at the whim or caprice of the legislative body. But within its legitimate domain the power is original, absolute, and indefeasible. It is vested in the legislative department of the government at its creation, without affirmative grant or definition, as an essential political power and attribute of government, and personal rights and rights of property are subordinate to this supreme power acting within its appropriate sphere. It may be exercised so as to impair the value of property, or limit or restrict the uses of property, yet in this there is no infringement of the constitutional guaranty, because the guaranty is not to be construed as liberating persons or property from the just control of the laws. It was designed for the protection of personal and private rights against encroachments by the legislative body not sanctioned by the principles of civil liberty as held and understood when the Constitution was adopted. The boundary of legislative power in the enactment of laws in the assumed exercise of this power of sovereignty, which injuriously affects persons or property, is indistinct, and no rule or definition can be formulated under which in all cases it can be readily determined whether a statute does or does not transgress the fundamental law.

The power of the British Parliament is not the test of legislative power under the written constitution of the American States. But the great landmarks of civil liberty embodied in our State constitutions were established by our English ancestors, and upon questions such as the one now before us we may study with profit the principles and practice of the law of England. When a statute is chal-

lenged as overstepping the boundaries of legislative power, the object sought to be attained by the Legislature, the nature and functions of the government, the principles of the common law, the practice of legislation and legal adjudications are pertinent and important considerations, and elements in the determination of the controversy. The act now in question regulates the price of elevating grain, and the regulation affects the compensation which may be lawfully demanded for labor and personal service, as well as for the use of property. It fixes a maximum charge for labor and the use of property when combined, as they of necessity are in the business of elevating grain. The operation of the statute is by its terms limited to the business carried on in cities and towns having a population of not less than 130,000—practically to the cities of Buffalo, New York, and Brooklyn. The circumstances also substantially restrict the application of the act to grain brought to Buffalo from the upper lakes by water, and there, by means of elevators, transshipped into canal-boats and transported through the Erie Canal and the Hudson River to the harbor of New York, and there discharged by elevators into warehouses or ocean vessels. The business of transporting grain by the lakes, and thence by the Erie Canal to New York, is one of great magnitude. The case shows that about 120,000,000 of bushels of grain annually come to Buffalo from the West. The business of elevating grain at that point is mainly connected with lake and canal transportation. It is shown by official records that the receipts of grain at New York in the year 1887 by way of the Erie Canal and Hudson River, during the season of canal navigation, exceeded 46,000,000 bushels, an amount very largely in excess of the amount received during the same period by rail and by river and coastwise vessels. The elevation of this grain from lake vessels to canal-boats takes place at Buffalo, where the case shows there are thirty or forty elevators, stationary and floating. How many of these elevators are actually employed in the business does not appear. The record is

silent as to many facts which might tend to explain the relation of this business, as actually conducted, to the public interests. It is asserted that a combination exists and has for several years existed between the elevator owners to maintain excessive charges by fixing a uniform tariff and pooling the earnings and dividing them ratably among all the elevator owners, although but a part of the elevators are actually operated. See Report of the Committee on Foreign Commerce of the Chamber of Commerce of New York, made in April, 1885. There is no evidence in the record as to the locations in the port of Buffalo suitable and available for stationary elevators. It is evident that they must be placed where they can be reached by both lake vessels and canal boats, and it may reasonably be assumed that but a limited area (not devoted to other purposes of commerce) is available for the erection of stationary elevators.

The case of Munn v. Illinois (94 U. S. 113), is a direct authority upon the question now before us. That case was brought to the United States Supreme Court on a writ of error, to review a judgment of the Supreme Court of the State of Illinois, which affirmed the constitutionality of a statute of that State fixing a maximum charge for the elevation and storage of grain in warehouses in that State. The act was challenged as a violation of the constitutional guaranty in the Constitution of Illinois, protecting life, liberty and property, in substantially the same language as in the Constitution of this State. The Supreme Court of the United States affirmed the judgment of the State court, on the ground that the legislation in question was a lawful exercise of legislative power, and did not infringe the clause in the fourteenth amendment of the Constitution of the United States, "nor shall any State deprive any person of life, liberty or property, without due process of law."

The legislation in question, in Munn v. Illinois, was similar to and is not distinguishable in principle from the act, chapter 581 of the Laws of 1888, now under review.

People v. Budd.

The question in that case was raised by an individual owning an elevator and warehouse in Chicago, which had been erected for and in connection with which he had carried on the business of elevating and storing grain for many years prior to the passage of the act in question, and prior also to the adoption of the amendment of the Constitution of Illinois in 1870, declaring all elevators and warehouses where grain or other property is stored for a compensation to be public warehouses. The case of Munn v. Illinois has been referred to by the court in several cases. People *ex rel.* etc. *v.* Boston & Albany R. R. Co., 70 *N. Y.* 569; Bertholf *v.* O'Reilly, 74 *Id.* 509; Buffalo East Side R. R. Co. *v.* Buffalo Street R. R. Co., 111 *Id.* 132; People *v.* King, 110 *Id.* 418.

In People *ex rel.* etc. *v.* Boston & Albany R. R. Co., which related to the power of the Legislature to compel the defendant to build a bridge at a point where the railroad of the defendant crossed a highway, the court, by EARL, J., said: "The whole subject of the legislative power over railroads, and even private persons holding and using their property for public purposes, has been so fully discussed recently in the Supreme Court of the United States, in the Granger cases, and in the Chicago elevator case, as to make further discussion unnecessary here. Such legislation violates no contract, takes away no property, and interferes with no vested right."

In Bertholf *v.* O'Reilly, Munn *v.* Illinois was cited as illustrating the scope of the police power in legislation. In Buffalo East Side R. R. Co. *v.* Buffalo Street R. R. Co., which involved the question of the right of the Legislature to regulate and reduce the fare on street railways in the City of Buffalo, which it was claimed affected a contract entered into between two of the companies prior to the passage of the act, this court affirmed the validity of the law, and RUGER, Ch. J., in pronouncing the opinion of the court, quoted the language of WAITE, Ch. J., in the Munn case, and also the language of BRADLEY, J., in the Sinking

Fund cases, 99 *U. S.* 747, declaring the principle decided in the Munn case, and these quotations were quite irrelevant unless the doctrine stated therein was intended to be approved.   In People *v.* King the doctrine of the Munn case was applied by this court to uphold the validity of a statute which prohibited the exclusion of any citizen from theaters or other places of amusement, by reason of race, color or previous condition of servitude, and a conviction in that case was sustained, where the defendant, the proprietor of a skating-rink, erected on his own property, opened it to the public, but excluded therefrom, on the occasion of a public entertainment, on the ground of race and color, a colored person who sought admission.   The court is not concluded by these cases, or any of them, from re-examining the principle on which the decision in Munn *v.* Illinois proceeded, but we can not overrule and disregard that case without, as I think, subverting the principle of our decision in the King case, and certainly not without disregarding many deliberate expressions of this court in approval of the principle of that decision.

It is an interesting question. as to what consideration should be given by a State court to a decision of the Supreme Court of the United States upon a question of constitutional law, rendered in the exercise of its jurisdiction, where the point in judgment relates to the validity of a State statute, which is challenged on the ground that it deprives a party of life, liberty, or property without due process of law, and the decision affirms the constitutionality of the statute. The jurisdiction of the Supreme Court of the United States to review the decision of a State court, sustaining a State statute which is alleged to be in violation of this constitutional principle, originated with the adoption of the fourteenth amendment of the Constitution of the United States, which for the first time introduced into the Federal Constitution the prohibition, "nor shall any State deprive any person of life, liberty or property without due process

People v. Budd.

of law." This was a new limitation in the Federal Constitution on the State governments.

Prior to the adoption of the fourteenth amendment, personal rights and rights of property were, as a rule, exclusively matters of State cognizance, and the State courts were the ultimate tribunals for the determination of questions arising under the constitutional guaranty of life, liberty and property, which was to be found only in the State Constitutions. Their decisions were not subject to review in the courts of the United States. Slaughter-house Cases, 16 *Wall.* 36. There were exceptions growing out of article 1, section 10, of the Federal Constitution, that "no State should pass any bill of attainder, *ex post facto* law, or law impairing the obligations of contracts," not material here. Since the fourteenth amendment, the question whether a State statute infringes the constitutional guaranty protecting life, liberty and property, where it arises in a State court, involves the consideration of both the Federal and State Constitutions, although the ground of construction and decision would be identical under either instrument. But whether the decision of the State court presents a Federal question reviewable on appeal to the Supreme Court of the United States depends on the nature of the decision of the State court; that is to say, whether it affirmed the validity of the statute, or held it to be unconstitutional and void. If the State court decides that the statute does violate the constitutional guaranty, its decision is now, as before the fourteenth amendment, final and conclusive, and no appeal can be taken to the Federal court, as in that case no right under the Constitution and laws of the United States has been denied. If, on the other hand, the State court sustains the statute and denies the right asserted, the Federal jurisdiction attaches, and appeal may be taken to the United States Supreme Court.

It can not be determined, we think, that a decision of the Federal court, sustaining a State statute is *res adjudicata* and binding upon a State court, when the same ques-

tion subsequently arises there under a similar statute. It would still be the duty of the State court, to examine and decide it according to its interpretation of the constitutional guaranty. But the respect due to the decision of that high tribunal, the fact that to it has been committed, by the consent of the States, the ultimate vindication of liberty and property against arbitrary and unconstitutional State legislation, and the fitness of things, emphasize and enforce, in the particular case, the settled rule that only when required by the most cogent reasons, or, indeed, unless compelled by unanswerable grounds, will a court declare a statute to be unconstitutional. "On more than one occasion," said Chief Justice MARSHALL, in the Dartmouth College Case (4 *Wheat.* 625), "this court has expressed the cautious circumspection with which it approaches the consideration of such questions, and has declared that in no doubtful case would it pronounce a legislative act to contrary to the constitution."

The power of the Legislature to regulate the charge for elevating grain where the business is carried on by individuals upon their own premises depends upon the question whether the regulation falls within the scope of what is called the police power, which is but another name for that authority which resides in every sovereignty to pass all laws for the internal regulation and government of the State necessary for the public welfare. The existence of this power is universally recognized. All property, all business, every private interest may be affected by it and be brought within its influence. Under this power the Legislature regulates the uses of property, prescribes rules of personal conduct, and in numberless ways, through its pervading and ever-present authority, supervises and controls the affairs of men in their relation to each other and to the community at large, to secure the mutual and equal rights of all, and to promote the interests of society. It has limitations; it cannot be arbitrarily exercised so as to deprive the citizen of his liberty or property.

People *v.* Budd.

But a statute does not work such deprivation in the constitutional sense, simply because it imposes burdens or abridges freedom of action, or regulates occupations, or subjects individuals or property to restraints in matters indifferent, except as they affect public interests or the rights of others. Legislation under the police power infringes the constitutional guaranty only when it is extended to subjects not within its scope and purview, as that power was defined and understood when the Constitution was adopted.

The generality of the terms employed by jurists and publicists in defining this power, while they show its breadth and universality of its presence, nevertheless leave its boundaries and limitations indefinite, and impose upon the court the necessity and duty as each case is presented, to determine whether that particular statute falls within or outside of its appropriate limits. "It is much easier," said Chief Justice Shaw, in Commonwealth *v.* Alger (7 *Cush.* 53), "to perceive and realize the existence of this power than to mark its boundaries or to prescribe limits to its exercise."

In determining whether the Legislature can lawfully regulate and fix the charge for elevating grain by private elevators, it must be conceded that the uses to which a man may devote his property, the price which he may charge for such use, how much he shall demand or receive for his labor, and the method of conducting his business are, as a general rule, not the subject of legislative regulation. These are a part of our liberty, of which, under the constitutional guaranty, we cannot be deprived. We have no hesitation in declaring that unless there are special conditions and circumstances which bring the business of elevating grain within principles which, by the common law and the practice of free governments, justify legislative control and regulation in the particular case, the statute of 1888 cannot be sustained. That no general power resides in the Legislature to regulate private business, prescribe the conditions under which it shall be conducted, fix the price of commodities or services, or interfere with freedom of con-

tract, we cannot doubt. The merchant and manufacturer, the artisan and laborer, under our system of government, are left to pursue and provide for their own interests in their own way, untrammeled by burdensome and restrictive regulations, which, however common in rude and irregular times, are inconsistent with constitutional liberty. The justification of the statute of Illinois regulating the charge for elevating and storing grain in the elevators of that State was placed in the Munn case upon that principle of the common law stated by Lord HALE in his treatise, *De Portibus Maris* (1 *Harg. Law Tracts*, 78), that when private property is " affected by public interest it ceases to be *juris privati* only." The principle of the decision is stated with great perspicuity by BRADLEY, J., in his opinion in the Sinking Fund cases (*supra*). He says : " The inquiry there was as to the extent of the police power where the public interest is affected; and we held that where an employment becomes a matter of such public interest and importance as to create a common charge or burden upon the citizen,—in other words, when it becomes a practical monopoly, to which the citizen is compelled to resort and by means of which a tribute can be exacted from the community,—it is subject to regulation by the legislative power." The elevators in Chicago had no legal monopoly in the business of elevating grain. The business was open to all comers, but the location of the elevators, their connection with the railroads on which most of the grain from the grain-producing States and Territories of the West and Northwest was brought to Chicago, the necessity of using them in the transfer, storing, and transshipment of grain, created, as was held by the court, a virtual and practical monopoly which affected the business and property with a public interest and subjected them to regulation by law. The application of the language of Lord HALE, and of the principle that private property may by its uses cease to be *juris privati* strictly, and become affected by a public interest, to the business of elevating grain in Chicago, was

combated and denied by FIELD, J., in his very able and forcible dissenting opinion. "It is," he declared, "only where some privilege in the bestowment of the Government is enjoyed in connection with (private) property, that it is affected by a public interest in any proper sense of the term. It is the public privilege connected with the use of the property which creates the public interest in it."

There can be no doubt that where the Government confers a special privilege upon a citizen, not of common right, it may annex such conditions upon its enjoyment as it sees fit. Nor can there be any question that where an individual has a legal monopoly to use his property for a public purpose, and the public have an interest in the use, he is subject to an obligation cast upon him by the common law to demand only a reasonable compensation for the use. This is stated with great clearness by Lord ELLENBOROUGH, in Allnut v. Inglis (12 East, 569). "There is," he said, "no doubt that the general principle is favored, both in law and justice, that every man may fix what price he pleases upon his property or the use of it; but if, for a particular purpose, the public have a right to resort to his premises and make use of them, and he have a monopoly in them for that purpose, if he will take the benefit of that monopoly, he must, as an equivalent, perform the duty attached to it on reasonable terms." But the question is whether the power of the Legislature to regulate charges for the use of property and the rendition of services connected with it depends in every case upon the circumstances that the owner of the property has a legal monopoly or privilege to use the property for a particular purpose, or has some special protection from the Government, or some peculiar benefit in the prosecution of his business. Lord HALE, in the treatises De Portibus Maris and De Jure Maris, so largely quoted from in the opinions in the Munn case, used the language that when private property is "affected with a public interest, it ceases to be juris privati only," in assigning the reason why ferries and public wharves

should be under public regulation and only reasonable tolls charged. The right to establish a ferry was a franchise, and no man could set up a ferry, although he owned the soil and landing-places on both sides of the stream, without a charter from the king, or a prescription time out of mind. The franchise to establish ferries was a royal prerogative, and the grant of the king was necessary to authorize a subject to establish a public ferry even on his own premises.

When we recur to the origin and purpose of this prerogative, it will be seen that it was vested in the king as a means by which a business, in which the whole community were interested, could be regulated. In other words, it was simply one mode of exercising a prerogative of Government; that is to say, through the sovereign instead of through Parliament, in a matter of public concern. This and similar prerogatives were vested in the king for public purposes, and not for his private advantage or emolument. Lord KENYON, in Rorke v. Dayrell (4 *Term R.* 410), said: "The prerogatives of the crown are not given for the personal advantage of the king; but they are allowed to exist because they are beneficial to the subject," and it said in *Chitty on Prerogatives* (page 4): "The splendor, rights, and power of the crown were attached to it for the benefit of the people, and not for the private gratification of the subject." And Lord HALE, in one of the passages referred to, in stating the reason why a man may not set up a ferry without a charter from the king, says: "Because it doth in consequence tend to a common charge and is become a thing of public interest and use, and every man for his passage pays a toll, which is a common charge, and every ferry ought to be under public regulation." The right to take tolls for wharfage in a public port was also a franchise, and tolls, as Lord HALE says, could not be taken without lawful title by charter or prescription (*De Portibus Maris,* page 77). But the king, if he maintained a public wharf, was under the same obligation as a subject to exact only reasonable tolls; nor could the king authorize unreasonable tolls

to be taken by a subject. The language of Lord HALE is explicit upon both these points: "If the king or subject have a public wharf in which all persons that come to that port must come to unload their goods, as for the purpose, because they are the wharves only licensed by the queen, according to the statute of 1 Elizabeth, chapter 11, or because there is no other wharf in that port, as it may fall out when a port is newly erected; in that case there cannot be taken arbitrary and excessive duties for cranage, wharfage, passage, etc. Neither can they be enhanced to an immoderate degree, but the duties must be reasonable and moderate, though settled by the king's license or charter." The contention that the right to regulate the charges of ferrymen or wharfingers was founded on the fact that tolls could not be taken without the king's license does not seem to us to be sound. It rested on the broader basis of public interest, and the license was the method by which persons exercising these functions were subjected to governmental supervision.

The king, in whom the franchise of wharfage was vested as a royal prerogative, was himself, as has been shown, subject to the same rule as the subject, and could only exact reasonable wharfage, nor could he by express license authorize the taking of more. The language of Lord HALE, that private property may be affected by a public interest, can not justly, we think, be restricted as meaning only property clothed with a public character by special grant or charter of the sovereign.

The control which by common law and by statute is exercised over common carriers is conclusive upon the point that the right of the Legislature to regulate the charges for services in connection with the use of property does not in every case depend upon the question of legal monopoly.

From the earliest period of the common law it has been held that common carriers were bound to carry for a reasonable compensation. They were not at liberty to charge whatever sum they pleased, and even where the price of

carriage was fixed by [the contract or convention of the parties, the contract was not enforceable beyond the point of reasonable compensation. From time to time statutes have been enacted in England and in this country fixing the sum which should be charged by carriers for the transportation of passengers and property, and the validity of such legislation has not been questioned. But the business of common carriers until recent times, was conducted almost exclusively by individuals for private emolument, and was open to everyone who chose to engage in it. The State conferred no franchise and extended to common carriers no benefit or protection, except that general protection which the law affords to all persons and property within its jurisdiction. The extraordinary obligations imposed upon carriers and the subjection of the business to public regulation were based on the character of the business, or, in the language of Sir WILLIAM JONES, upon the consideration "that the calling is a public employment." *Jones on Bailments,* Appendix. It is only a public employment in the sense of the language of Lord HALE, that it was "affected with a public interest," and the imposition of the character of a public business upon the business of a common carrier was made because public policy was deemed to require that it should be under public regulation. The principle of the common law that common carriers must serve the public for a reasonable compensation became a part of the law of this State, and from the adoption of the Constitution has been part of our municipal law.

It is competent for the Legislature to change the rule of reasonable compensation, as the matter was left by the common law, and prescribe a fixed and definite compensation for the services of common carriers. This principle was declared in the Munn case, which was cited with approval on this point in Sawyer v. Davis (136 *Mass.* 239). It accords with the language of Chief Justice SHAW in Commonwealth v. Alger (*supra*): " Whenever there is a general right on the part of the public, and a general duty of the land-

owner, or any other person, to respect such right, we think it is competent for the Legislature by a specific enactment to prescribe a precise practical rule for declaring, establishing and securing such right and enforcing respect for it." The practice of the Legislature in this and other States to prescribe a maximum rate for the transportation of persons or property on railroads is justified upon this principle.

Where the right of the Legislature to regulate the fares or charges on railroads is reserved by the charter of incorporation, or the charter was granted subject to the general right of alteration or repeal by the legislature, the power of the legislature in such cases to prescribe the rate of compensation is a part of the contract, and the exercise of the power does not depend upon any general legislative authority to regulate the charges of common carriers. But the cases are uniform that where there is no reservation in the charter the Legislature may nevertheless interfere and prescribe or limit the charges of a railroad corporations. The Granger cases, *supra ;* Dow *v.* Beidelman, 125 *U. S.* 680 ; EARL, J., in People *ex rel. v.* Boston and Albany Railroad Company *supra ;* RUGER, Ch. J., in Buffalo East Side Railroad Company *v.* Buffalo Street Railroad Company (*supra*).

The power of regulation in these cases does not turn upon the fact that the entities affected by the legislation are corporations deriving their existence from the State, but upon the fact that the corporations are common carriers, and therefore subject to legislative control. The State in constituting a corporation may prescribe or limit its powers and reserve such control as it sees fit, and the body accepting the charter takes it subject to such limitations and reservations, and is bound by them. The considerations upon which a corporation holds its franchise are the duties and obligations imposed by the act of incorporation. But when a corporation is created, it has the same rights and the same duties, within the scope marked out for its action, that a natural person has. Its property is secured to it by the same constitutional guaranties, and in the management of

its property and business is subject to regulation by the Legislature to the same extent only as natural persons, except as the power may be extended by its charter.

The mere fact of a corporate character does not extend the power of legislative regulation. For illustration, it could not justly be contended that the Act of 1888 would be a valid exercise of legislative power as to corporations organized for the purpose of elevating grain, although invalid as to private persons conducting the same business. The conceded power of legislation over common carriers is adverse to the claim that the police power does not in any case include the power to fix the price of the use of private property, and of services connected with such use, unless there is a legal monopoly, or special governmental privileges or protection have been bestowed. It is said that the control which the Legislature is permitted to exercise over the business of common carriers is a survival of that class of legislation which in former times extended to the details of personal conduct, and assumed to regulate the private affairs and business of men in the minutest particulars. This is true. But it has survived, because it was entitled to survive. By reason of the changed conditions of society, and a truer appreciation of the proper functions of government, many things have fallen out of the range of the police power as formerly recognized, the regulation of which by legislation would now be regarded as invading personal liberty. But society could not safely surrender the power to regulate by law the business of common carriers. Its value has been infinitely increased by the conditions of modern commerce, under which the carrying trade of the country is, to a great extent, absorbed by corporations, and as a check upon the greed of these consolidated interests the legislative power of regulation is demanded by the most imperative public interests.

The same principle upon which the control of common carriers rests, has enabled the State to regulate in the public interest the charges of telephone and telegraph companies,

People *v.* Budd.

and to make the telephone and telegraph, those important agencies of commerce, subservient to the wants and regulations of society. These regulations in no way interfere with a rational liberty regulated by law. There are elements of publicity in the business of elevating grain which peculiarly affect it with a public interest. They are found in the nature and extent of the business, its relation to the commerce of the State and country, and the practical monopoly enjoyed by those engaged in it. The extent of the business is shown by the facts to which we have referred. A large proportion of the surplus cereals of the country passes through the elevators at Buffalo and finds its way through the Erie Canal and Hudson River to the seaboard at New York, from whence it is distributed to the markets of the world. The business of elevating grain is an incident to the business of transportation. The elevators are indispensable instrumentalities in the business of the common carrier. It is scarcely too much to say that, in a broad sense, the elevators perform the work of carriers. They are located upon or adjacent to the waters of the State, and transfer from the lake vessels to the canal-boats, or from the canal-boats to the ocean vessels, the cargoes of grain, and thereby perform an essential service in transportation.

It is by means of the elevators that transportation of grain by water from the upper lakes to the seaboard is rendered possible. It needs no argument to show that the business of elevating grain has a vital relation to commerce in one of its most important aspects. Every excessive charge made in the course of the transportation of grain is a tax on commerce, and the public have a deep interest that no exorbitant charges shall be exacted at any point upon the business of transportation. The State of New York, in the construction of the Erie Canal, exhibited its profound appreciation of the public interest involved in the encouragement of commerce. The Legislature of the State, in entering upon the work of constructing a waterway between

Lake Erie and the Atlantic Ocean, sets forth in the preamble of the originating act of 1817 its reasons for that great undertaking. "It will," the preamble says, "promote agriculture, manufactures, and commerce, mitigate the calamities of war and enhance the blessings of peace, consolidate the Union, and advance the prosperity and elevate the character of the United States." In the construction and enlargement of the canal the State has expended vast sums of money raised by taxation, and finally, to still further promote the interests of commerce, it has made the canal a free highway, and maintains it by a direct tax upon the people of the State. The wise forecast and statesmanship of the projectors of this work have been amply demonstrated by experience. It has largely contributed to the power and influence of the State, promoted the prosperity of the people, and to it, more perhaps than to any other single cause, is it owing that the City of New York has become the commercial center of the Union. Whatever impairs the usefulness of the canal as a highway of commerce involves the public interest. The people of New York are greatly interested to prevent any undue exactions in the business of transportation which shall enhance the cost of the necessaries of life, or force the trade in grain into channels outside of our State. In Hooker *v.* Vandewater (4 *Den.* 349) the court was called upon to consider the validity of an agreement between certain transportation lines on the canals to keep up the price of freights. The court held the agreement to be illegal, and Jewett, J., in pronouncing the judgment of the court, said : "That the raising of the price of freights for the transportation of merchandise or passengers upon our canals is a matter of public concern, and in which the public have a deep interest, does not admit of doubt. It is a familiar maxim that competition is the life of trade. It follows that whatever destroys or even relaxes competition in trade is injurious, if not fatal, to it."

The same question came up a second time in Stanton *v.* Allen (5 *Den.* 434), and was decided the same way. In the

course of its opinion the court said: "As these canals are the property of the State, constructed at great expense as facilities to trade and commerce, and to foster and encourage agriculture, and are at the same time a magnificent source of revenue, whatever concerns their employment and use-fulness deeply involves the interest of the whole State." The fostering and protection of commerce was, even in the ancient times, a favorite object of English law (*Chitty on Prerogatives*, 162), and this author states that the "super-intendence and care of commerce, on the success of which so materially depends the wealth and prosperity of the nation, are in various cases allotted to the king by the constitution," and many governmental powers vested in the sovereign in England have, since our revolution, devolved on the Legislatures of the States. The statutes of England in earlier times were full of oppressive commercial regula-tions, now, happily, to a great extent abrogated; but that the interests of commerce are matters of public concern all States and governments have fully recognized.

The third element of publicity which tends to distinguish the business of elevating grain from general commercial pursuits is the practical monopoly which is or may be con-nected with its prosecution. In the city of Buffalo the elevators are located at the junction of the canal with Lake Erie. The owners of grain are compelled to use them in transferring cargoes. The area upon which it is practicable to erect them is limited. The structures are expensive, and the circumstances afford great facility for combination among the owners of elevators to fix and maintain an exorbitant tariff of charges, and to bring into the combination any new elevator which may be erected, and to employ it or leave it unemployed, but in either case permit it to share in the aggregate earnings. It is evident that if such a combination in fact exists, the principle of free competition in trade is excluded. The precise object of the combination would be to prevent competition. The result of such a combination would necessarily be to subject the lake vessels and canal-

boats to any exaction which the elevator owners might see fit to impose for the service of·the elevator, and the elevator owners would be able to levy a tribute on the community, the extent of which would be limited only by their discretion.

It is under these various circumstances that the court is called upon to determine whether the Legislature may interfere and regulate the charges of elevators. It is purely a question of legislative power. If the power to legislate exists, the court has nothing to do with the policy or wisdom of the interference in the particular case, or with the question of the adequacy or inadequacy of the compensation authorized. "This court," says CHASE, Ch. J., in the License Tax case (5 *Wall.* 469), "can know nothing of public policy, except from the Constitution and the laws, and the course of administration and decision. It has no legislative powers. It cannot amend or modify any legislative act. It cannot examine questions as expedient or inexpedient, as politic or impolitic. Considerations of that sort must be addressed to the Legislature. Questions of policy there are concluded here." Can it be said, in view of the exceptional circumstances, that the business of elevating grain is not "affected with the public interest," within the language of Lord HALE, or that the case does not fall within the principle which permits the Legislature to regulate the business of common carriers, ferrymen, innkeepers, hackmen, and the interest on the use of money?

It seems to us that.speculative, if not fanciful, reasons have been assigned to account for the right of legislative regulation in these and other cases. It is said that the right to regulate the charges of hackmen springs from the fact that they are assigned stands in the public streets; that the Legislature may regulate the toll on ferries, because the right to establish a ferry is a franchise, and, therefore, the business is subject to regulation; that the right to regulate wharfage rested upon the permission of the sovereign to extend wharves into the bed of navigable streams, the title

People v. Budd.

to which was in the sovereign; that the right to regulate the interest in the use of money sprung from the fact that taking interest was originally illegal at common law, and that where the right was granted by statute it was taken subject to regulation by law. The plain reason, we think, why the charges of hackmen and ferrymen were made subject to public regulation is that they were common carriers. The reason assigned for the right to regulate wharfage in England overlooks the fact that the title to the bed of navigable streams was frequently vested in a subject, and was his private property, subject to certain public rights, as the right of navigation, and no distinction as to the power of public regulation is suggested in the ancient books between wharves built upon the bed of navigable waters, the title to which was in the sovereign, and wharves erected upon navigable streams, the bed of which belonged to a subject. The obligation of the owner of the only wharf in a newly erected port to charge only reasonable wharfage is placed by Lord HALE on the ground of a virtual, as distinguished from a legal, monopoly.

The reason assigned for the right to regulate interest takes no account of the fact that the prohibition by the ancient common law to take interest at all was a regulation, and this manifestly did not rest upon any benefit conferred on the lenders of money. It was a regulation springing from a supposed public interest, and was peculiarly oppressive on a certain class. A law prohibiting the taking of interest on the use of money would now be deemed a violation of a right of property. But the material point is that the prohibition, as well as the regulation of interest, was based upon public policy, and the present conceded right of regulation does not have its foundation in any grant or privilege conferred by the sovereign.

The attempts made to place the right of public regulation in these cases upon the ground of special privilege conferred by the public on those affected can not, we think, be supported. The underlying principle is that business of

certain kinds holds such a peculiar relation to the public interests that there is superinduced upon it the right of public regulation.   We rest the power of the legislature to control and regulate elevator charges on the nature and extent of the business, the existence of a virtual monopoly, the benefit derived from the canal creating the business and making it possible, the interest to trade and commerce, the relation of the business to the prosperity and welfare of the State, and the practice of legislation in analogous cases. These circumstances collectively create an exceptional case and justify legislative regulation.   The case of Munn *v.* Illinois has been frequently cited with approval by courts in other States.   Nash *v.* Page, 80 *Ky.* 539; Hackett *v.* State, 105 *Ind.* 250; Chesapeake and Potomac Telephone Company *v.* Baltimore and Ohio Telegraph Co., 66 *Md.* 399 ; Davis *v.* State, 68 *Ala.* 188.    In Nash *v.* Page it was held, upon the doctrine of the Munn case, that warehousemen for the public sale and purchase of tobacco in Louisville exercised a public business and assumed obligations to serve the entire public, and could not exclude persons from buying or selling tobacco in their warehouse who were not members of the Board of Trade.   In Hackett *v.* State it was held that the relations which telephone companies have assumed toward the public imposed public obligations, and that all the instruments and appliances used by telephone companies in the prosecution of the business were, in legal contemplation, devoted to public use.   In Chesapeake, etc., Tel. Co. *v.* B. & O. Tel. Co., legislation prohibiting discrimination in the business of telegraphing was upheld on the doctrine of the Munn case.   The criticism to which the Munn case has been subjected has proceeded mainly on a limited and strict construction and definition of the police power.   The ordinary subjects upon which it operates are well understood.

It is most frequently exerted in the maintenance of public order, the production of the public health and public morals, and in regulating mutual rights of property, and

the use of property, so as to prevent uses by one of his property to the injury of the property of another. These are instances of its exercise, but they do not bound the sphere of its operation. In the King case (110 $N.$ $Y.$ 418) it was given a much broader scope, and was held to be efficient to prevent discrimination on the ground of race and color in places opened for public entertainments. In that case the owner of the skating rink derived no special privilege or protection from the State. The public held no right in any legal sense to resort to his premises. His permission, except for the public interest involved, was revocable as to the whole community or any individual citizen. But it was held that so long as he devoted his place to purposes of public entertainment he subjected it to public regulation.

There is little reason, under our system of government, for placing a close and narrow interpretation on the police power, or in restricting its scope, so as to hamper the legislative power in dealing with the varying necessities of society, and the new circumstances as they arise calling for legislative intervention in the public interest. Life, liberty and property have a substantial protection against serious invasion by the Legislature in the traditions of the English-speaking race, and a pervading public sentiment which is quick to resent any substantial encroachment upon personal freedom or the rights of property. In no country is the force of public opinion so direct and imperative as in this. The Legislature may transgress the principles of the Constitution. It has done so in the past, and it may be expected that it will sometimes do so in the future. But unconstitutional enactments have generally been the result of haste or inadvertence, or of transient and unusual conditions in times of public excitement which have been felt and responded to in the halls of legislation.

The framers of the Government wisely interposed the judicial power and invested it with the prerogative of bringing every legislative act to the test of the Constitu-

tion. But no serious invasion of constitutional guaranties by the Legislature can for a long time withstand the searching influence of public opinion, which, sooner or later, is sure to come to the side of law and order, and justice, however much for a time it may have been swayed by passion or prejudice, or whatever aberrations may have marked its course. So, also, in the wide range of legislative powers over persons and property which lie outside of the prohibitions of the Constitution, and which inhere of necessity in the very idea of government, by which persons and property may be affected without transgressing constitutional guaranties, there is a restraining and corrective power in public opinion which is a safeguard of tremendous force against unwise and impolitic legislation, hampering individual enterprise, and checking the healthful stimulus of self-interest, which are the life-blood of commercial progress. The police power may be used for illegitimate ends, although no court can say that the fundamental law has been violated. There is a remedy at the polls, and it is an efficient remedy if, at the bottom, the legislation under it is oppressive and unjust. The remedy, by taking away the power of the Legislature to act at all would indeed be radical and complete. But the moment the police power is destroyed or curbed by fixed and rigid rules, a danger is introduced into our system which would, we think, be far greater than results from an occasional departure by the Legislature from correct principles of government.

We here conclude our examination of the important question presented by this case. The division of opinion in this and other courts is evidence of the difficulty which surrounds it. But it is ever to be remembered that a statute must stand so long as any reasonable doubt can be indulged in favor of its constitutionality. We are of opinion that the statute of 1888 is constitutional, as a whole, and that, although it may comprehend cases which, standing alone, might not justify legislative inference, yet they must be governed by the general rule enacted by the Legislature.

The judgment should be affirmed.

RUGER, Ch. J., EARL, DANFORTH and FINCH, JJ., concur. GRAY reads for reversal, and PECKHAM, J., concurs.

Judge GRAY, in this case, delivered the following dissenting opinion :

GRAY, J.—I am unable to assent to the views expressed in the opinion of the court in this case. Judge PECKHAM has thoroughly examined and considered the question in People *v.* Walsh, a similar case, and I concur with him in that opinion. As his opinion exhaustively reviews the cases and the text-books, I shall attempt no extended nor historical discussion, but will briefly state the grounds of my dissent.

This legislation is sought to be upheld as constitutional upon the ground that it is within a proper exercise of the sovereign power to prescribe regulations, when demanded by the general welfare for the common protection of all. It is said to fall within the scope of the police power of the State. If this is true of this measure, then I fail to see where are the limits within which the exercise of that power can be confined. This act undertakes to regulate the prices which can be charged by an individual in the prosecution of his private business. Its provisions are attempted to be justified in this case because, it is said, the business in question is a virtual monopoly ; owes its profitable existence to the benefit conferred by the Erie Canal; and the interests of trade and commerce and the welfare of the State demand that its charges should be regulated by the sovereign power. The plea for the extension of the police power—to the extent named, of interfering with the conduct of a legitimate private business enterprise—seems to me to find no support in reason, and it certainly tends to nullify that provision of the Constitution which is supposed to guarantee to each individual that he shall not be deprived of his life, or liberty, or property, without due process of law.

The learned judge writing the opinion concedes that the uses to which a man may devote his property, the price which he may charge for such use, how much he shall demand or receive for his labor, and the methods of conducting his business are, as a general rule, not the subjects of legislative regulation. He well says that "these are a part of our liberty, of which, under the constitutional guaranty, we can not be deprived." He believes, however, that he finds in this particular business of elevating grain "special conditions and circumstances" which justify legislative control. In my view, the concession which the learned judge is obliged to make with respect to our constitutional liberties impairs the force and effect of his opinion, unless he is able to show that the business in question is affected with a public use or interest within the strict and proper meaning of the term. This I do not see that he accomplishes. The circumstances amount to nothing more than that the transshipment of grain from and to barges, vessels and cars is more expeditiously and advantageously done through the use of grain elevators, than in any other way, and those persons who are interested in the shipment of grain must, for the better promotion of their private interests, have resort to them. It may be admitted that the use of the grain elevator is necessary to the grain shipper for the profitable or successful transaction of his business. But do such facts invest the grain elevating business, which the individual carries on, with such a public character as to give the public the right to regulate the charges which the owner may make? If the question affected a corporation deriving its franchises and powers from the State, a different case would be presented. But here we have the case of an individual conducting his private business in a legitimate manner and owing nothing to the State, for privileges or powers, or assistance conferred. He exercises the right, common to all, of engaging in a legitimate business for his own profit and gain.

I understand it to be the general rule that the individual

has absolute liberty to pursue his vocation and to con-
tract with respect to his property, subject only to the re-
striction that he may not interfere therein with his neigh-
bor's rights or use of property. He is bound to use his own
property so as not to injure his neighbor's. That liberty I
take to be guaranteed by the Constitution to him and to be
a most valuable right. What force or reason has the sug-
gestion that the business of the individual sustains some
important relation to a branch of trade in which other per-
sons are largely engaged, and that it is therefore public in
its nature, and therefore it should become the subject of
legislative control as to charges? Is it because those other
persons complain of the charges and allege that the business
as managed by those engaged in it is virtually a monopoly?
Has government any concern or interest in the price which
one individual may demand of another who resorts to him
because of his superior business skill or facilities? How
does the magnitude or the publicity of an individual's busi-
ness furnish a valid reason for legislative interference?
Every business is, in a measure, public, and is dependent
upon public patronage for its maintenance and success. It
is not compulsory upon the public to resort to these eleva-
tors; nor is the business exclusive or beyond competition.
There is a very wide distinction between those cases, which
are referred to in the books, and which Lord ELLENBOROUGH
speaks of (12 *East*, 539), where the public have a right to
resort to the premises of the individual and to make use of
them, and that individual has a monopoly in them for that
purpose, and the case of an individual prosecuting his own
business upon his own premises, by no leave, privilege, or
franchise, of the sovereign power. Here it is a matter of
option, or rather of agreement with the owner, whether his
premises may be resorted to and his property used by other
persons. The public have no independent legal right to
make use of them.

I believe the constitutional rights of the individual are
directly attacked by this legislation. Under the pretense

that his business has, by its magnitude and situation, become invested with a public interest, it is claimed to be brought within the right of the Government to regulate. Where is the limit to the exercise of sovereign power if such a pretext is considered a justification? Of what use are our vaunted constitutional guaranties if we may be deprived of property rights on so flimsy a pretext? It is said that the remedy for such oppressive and unjust legislation is to be found at the polls. I do not think that to be the only resort of the citizen. The constitutional guaranties were provided for and are enforceable by him for his protection.

I can not believe that the theory, or the frame of our form of government, involved the idea that so great a power should be lodged in the Legislature.·

If the door is opened to this species of legislation, what protection have we against socialistic laws? What is to prevent subsequent Legislatures from interfering with any other kind of private enterprise, if, from improved methods in its conduct and for peculiar reasons, it appears to the legislative body to virtually monopolize that branch of business, and that the owner takes advantage of his diligence, or superior skill and advantages, to demand what to them seems an apparently high or even excessive price in his labor or property of those who resort to him? The Legislature, in effect, says to the individual, when interfering to regulate the charges he may make in his business, it is true you are a private individual engaged in a private and legitimate business, in the prosecution of which you are authorized and protected by the Constitution; but, nevertheless, we think, in the public interest, because your business has become so advantageous and so necessary to a large portion of the public because of its superior facilities, that you shall not be allowed to pursue it unless you reduce your charges to a rate fixed by us. As well may the Legislature claim a right to interfere to reduce and regulate the charges which a combination of manufacturers have fixed for a certain line of goods. It seems to me that the theory of such legis-

lation is a startling departure from the true conception of governmental functions. They should work to protect and develop private rights and to secure to all individuals the uniform operation of the constitutional guarantees. The police power is incapable of being stretched to reach such a case as this, if we have any respect for the provisions of the Constitution. That power is properly exercised in the preservation of the private rights of individuals, in the maintenance of public order, in the supervision of public health and morals, and in the prevention of a conflict of rights. Its justification for interference with a private, legitimate business is admissible only when that business may be said to be affected by a public use or interest by reason of some aid, grant or privilege conferred by the State. Judge COOLEY says in his valuable work on Constitutional Limitations (p. 739), "the mere fact that the public have an interest in the existence of the business and are accommodated by it cannot be sufficient, for that would subject the stock of the merchant and his charges, to public regulation."

This act, in my opinion, was an unconstitutional exercise of power by the Legislature. Such legislation was not demanded by the general welfare, and it violates this social compact under which we live. It is a subversion of the constitutional guaranty. It is against such legislation that the constitutional guaranty was framed, and that the judicial power was intended by the Constitution to afford protection to the individual.

I think the judgment should be reversed and the appellant discharged.

PECKHAM, J., concurs.

Judgment affirmed.

———

In People *ex rel.* Annan *v.* Walsh, and People *ex rel.* Pinto *v.* Walsh, the orders of the General Term dismissing

the writs of *habeas corpus* and certiorari, were affirmed by the Court of Appeals on the foregoing opinion in People *v.* Budd; Judges PECKHAM and GRAY dissenting.

In these two cases, Judge PECKHAM wrote the following dissenting opinion:

PECKHAM, J.—[Dissenting.]—The Federal Supreme Court has decided that a statute of the State of Illinois, which is somewhat similar to the one under consideration here, was a valid law, so far as the Federal Constitution was concerned, and that it violated no right, privilege or immunity protected by that instrument.

A clause exists in the Constitution of this State which is similar to one of those in the Federal Constitution, under which the claim of invalidity was made and denied as to the Illinois statute. The case of Munn *v.* Illinois (94 *U. S.* 113), establishes the point that the Illinois statute there under discussion, as applied to the particular facts of that case, did not violate any provision of the Federal Constitution, nor infringe upon any privilege or immunity protected by it.

The facts in these New York cases differ considerably, in certain particulars, from those in the Munn case; and if the principles decided in that case were upheld, it might still become of the greatest importance to distinguish these differences and to discuss and decide upon their materiality as applicable to the question of the subjection of the defendants to the provisions of this act. But the question which arises *in limine* is based upon the assumption that the cases are substantially alike in their facts, and the question is this: In construing a clause in our State Constitution similar to one in the Federal instrument, should we follow the interpretation of such clause as given by the Federal court, which interpretation compels us to deny to these defendants the relief they ask for, although otherwise we are satisfied that they are justly entitled to that relief.

If any right, privilege or immunity claimed under the

People *ex rel.* Annan *v.* Walsh.

Federal Constitution or laws be denied by this court, its decision is reviewable in the Supreme Court, and in such cases it is our duty to follow in the footsteps of that court, and to be guided and controlled by its decisions. But in this case the right is claimed under our State Constitution, and in matters pertaining to its proper construction our decision is final, excepting that if, as construed by us, the Constitution, or our laws, deny the existence of some right or privilege claimed by a party by virtue of the Federal Constitution or laws, our decision is reviewable by the Federal court, not for the purpose of reviewing our construction of our own Constitution or laws, but to see whether, under the Constitution or laws as construed by us, any right or privilege existing by virtue of the Federal Constitution or laws has been violated or denied, and, if so, to give it effect, notwithstanding the State law or Constitution. But where we deny no right or privilege claimed, and, on the contrary, assert and protect it, there is no review by the Federal court possible.

When the privilege or immunity is claimed under our State Constitution, and we believe that it is rightfully and legally claimed, although the claim rests upon a clause which is similar to the one in the Federal court; nevertheless we ought, as we think, to give expression to our own judgment, under the sanction of our official duty, to declare the law as we believe it to exist, notwithstanding we differ with the conclusions arrived at by the Federal court. In so doing we decide against no right, privilege or immunity claimed under the Federal Constitution or laws, but, as a State court, we decide in a matter over which we have full jurisdiction, upon the proper construction to be given to the fundamental law of the State. We, therefore, proceed to give our views on the subject-matter involved in these appeals.

It is, perhaps, needless to inaugurate the discussion of the question by an expression of the very great respect we feel for the Federal Supreme Court, and for each of its

distinguished and learned members, and yet in doing so we but give voice to the sentiments which, as we believe, possess judges and citizens alike throughout the land. It is only in the performance of our official duty that we venture to differ from that court regarding matters which we are bound to decide, and when there is an equal obligation to decide them in accordance with our own deliberate views.

The case of Munn *v.* Illinois, 94 *U. S.* 113, has been referred to in our court but sparingly, as there has not been very frequent occasion for such reference.

It was referred to in Bertholf *v.* O'Reilly, 74 *N. Y.* 509; Boardman *v.* Lake Shore & Michigan Southern Railroad Company, 84 *Id.* 157, 186; People *v.* King, 110 *Id.* 418, 424, 428, and in Buffalo East Side Railroad Company *v.* Buffalo Street Railroad Company, 111. *Id.* 132. These are the only cases I have observed, although there may be others which have escaped my attention.

In Bertholf *v.* O'Reilly, 74 *N. Y.* 509, it was decided, that the legislature has power to create a cause of action for damages in favor of one who is injured in person or property by the act of an intoxicated person, against the owner of real property, whose only connection with the injury is that he leased the premises where the liquor causing the intoxication was sold or given away, with knowledge that intoxicating liquors were to be sold thereon.

In speaking of the police power, Andrews, J., in the above case cited the Slaughter House Cases (16 *Wall.* 36), and Munn *v.* Illinois, to show how far courts have gone in upholding legislation affecting private rights and property as a due exercise of the police power residing within the State. He said those "cases may perhaps be deemed to have carried the right of legislative interference with private rights and property to its utmost limit, but they illustrate the scope of the police power in legislation."

The legislation in question in the Bertholf case was placed upon the right of the Legislature to control the use and traffic in intoxicating liquors, and its authority to im-

pose liabilities upon those who exercise the traffic or who sell or give away intoxicating drinks, for consequential injuries to others, the court said, follows as a necessary incident. Such right of legislation as to the prohibition or regulation of the sale, etc., of intoxicating liquors comes within the narrowest definition of the police power, and is substantially denied by no one.

In the Bertholf case there was nothing which called for the approval or affirmance of the case of Munn, or the very broad principle asserted in and underlying that case. It was referred to, as stated in his opinion by ANDREWS, J., for the simple purpose of showing to what extent some courts had gone, and it was stated to be one where the right had been carried to its utmost limit, but the limit itself was neither approved nor disapproved. Nothing in Boardman *v.* Lake Shore, etc. Co., 84 *N. Y.* 157, 186, is material upon the question. It was simply stated that the Munn case did not bear out the contention for which it was cited by the appellant.

In People *v.* King, 110 *N. Y.* 418, 424, 428, the question was whether the law securing to colored persons the right to admission on equal terms with others to public resorts and to equal enjoyment of privileges of a *quasi* public character, was a valid law as applied to defendant's place of amusement. It was held so to be.

The police power, it is acknowledged, may be rightfully exercised, among others, in cases involving the public health or the public morals. No one questions it in regard to either of those two important branches of government. The extent of its proper exercise in such cases is open, however, to some differences of opinion. The place of amusement of King was held to be so far public with reference to this specific power as to permit of its exercise, and the very point of the decision was that the public had this right of resort to plaintiff's premises by his own dedication, even including colored persons, upon payment of the prescribed fee.

Judge COOLEY supports the legality of laws regulating places for public amusement, such as theaters, etc., upon the ground that they are properly the subject of police regulation, as they are generally licensed by the State or municipality wherein they exist.    See *Cooley on Torts*, 285.    But I have failed to observe any statute in this State which attempts to limit the *price* which a theatrical manager shall be allowed to charge for admission to his entertainments.    Proper police regulations and inspection, to the end that peace and good order may be obtained and public morals reasonably protected, is one thing, while a power to limit compensation is another and far greater and more dangerous power, and the two powers are not necessarily co-existent.    The latter power is not only a dangerous one, but it is not called for by the same principles which permit, and, indeed, demand the exercise of the former under a general right to regulate the manner, within reasonable rules, in which a man shall use his property so as not to improperly interfere with the proper enjoyment by his neighbor of his own property, or so as not to injure the public health or morals, and in order that proper safeguards may be observed for escape in times of fire.

In the King case, Judge ANDREWS said : " The principle stated by WAITE, Ch. J., in Munn *v.* Illinois, which received the assent of a majority of the court, applies in this case," the principle being that where one devotes his property to a use in which the public have an interest, he, in effect, grants to the public an interest in such use, and must submit to be controlled by the public for the common good to the extent of the interest he has thus created.    There was nothing in the case in this court which affirmed the correctness of the doctrines of the Munn case, as applied to the facts upon which the decision in that case was based.

In Buffalo East Side Railway Co. *v.* Buffalo Street Railway Co. (*supra*), both parties were corporations.    RUGER, Ch. J., said it was unnecessary to discuss the proposition with much fullness, as it was conceded by the appellant

that the authority of the Legislature, in the exercise of the police power, could not be limited by provisions in contracts between individuals or corporations, and the contract between the parties as to the rate of fare was held subordinate to the legislative power to regulate the fare to be charged by the corporations.

The Munn case proceeded upon the principle that the parties had devoted their property to a public use, because the productions " of seven or eight great States of the West" had to pass through their elevators for transshipment into vessels on their way to " four or five States on the sea shore," and that thus they had a " virtual " monopoly of that business, which created a right, on the part of the State, to regulate or limit the amount of their compensation for such use.   It was placed on the theory of an implied grant on the part of the owners of such property to the public to thus limit the compensation, and such grant was implied because the property was thus devoted by the owners to a public use.

Two factors seem to have entered into the proposition as developed by the court, one of which was the extent of the business, and the other that in its performance there was a " virtual " monopoly.   The combination of extent of user and so-called virtual monopoly seems, in the mind of the court, to have had the effect of clothing the property with this public interest, and hence to have imposed upon its owners the necessity of submitting to the limitation of their compensation.   It has never been carried to any such extent in this State.   Various instances of the application of these principles were cited by way of illustration, and it was asserted that no new principle of the law was created, but simply an application of an old principle to a new and different state of facts.

The learned chief justice, who delivered the opinion of a majority of the court, after citing these instances, thus continued :  " Under such circumstances it is difficult to see why, if the common carrier, or the miller, or the ferryman,

or the innkeeper, or the wharfinger, or the baker, or the cartman, or the hackney coachman, pursues a public employment and exercises a sort of public office, these plaintiffs in error do not. Therefore it was held that the business done by the owners of the elevators or warehouses was such as to clothe their property thus used with a public interest, and it ceased to be *juris privati* only.

I have examined, with very great care and attention, the various authorities cited by the court as illustrations of the principle laid down, and, with great diffidence, I am compelled to say, as the result of such examination, that it seems to me they do not justify the application of the principle to the case then before the court. See *Tiedeman on Limitations of the Police Power*, 230. If it be assumed that when one devotes or dedicates his property to a public use the public then has an interest in such use, and that, therefore, his compensation may be limited by law, still I deny that such devotion or dedication is made merely because the owner has embarked his property in a business in which large numbers of the public are interested in its use; and I also deny that any such person has a virtual or any monopoly in the business without a grant thereof from the sovereign power, merely because the property is conveniently situated for the business, and it would cost a large amount of money to duplicate it. So long as every one is free to go into the same business, and invest his capital therein with the same rights and privileges as those who are already engaged in it, there can be no monopoly, in the legal acceptation of that term, virtual or otherwise.

I contend that, within the subject now under review, the meaning of the phrase "devoting one's property to a public use," as evidenced in the cases cited by the learned chief justice, and also in other cases in this State, is that such devotion or dedication is made when by reason of it the public thereafter have a legal right to resort to the property, and to use it for a reasonable compensation, or for such as the law provides, or else where some privilege or right is

granted by the government, in which case the right of limitation is based upon and is really a part consideration for the grant.

In the one case the legal right to resort to and use the property by the public, so long as the owner chooses to remain in the business, springs from this dedication, and it is the criterion that is to decide the question whether the property has or has not been thus dedicated; and this right does not spring into existence merely because the business is such as interests a great number of the public, or because it is of large extent, or because there is no other property at that place which is or conveniently may be devoted to the same kind of business; while, in the other case, the right of limitation exists because some privilege or franchise has been granted to the owner by the sovereign power, an acceptance of which carries with it the burden of submitting to the demand for the service.

As has been said, the right to regulate places of public amusement, such as theaters and the like, comes from another branch of the police power, and, as I believe, does not extend to the power to limit prices. The right to make use of the owner's property, by reason of a dedication, has been held to have been created in the exceptional cases of a common carrier, the keeper of a common inn, and a common or public wharfinger, and perhaps in some others. These are exceptional cases, for they trench upon the well-grounded principle that no man can be compelled to enter into business relations with another unless the party carrying on the business shall have received some privilege, right, or franchise from the sovereign power, when such compulsion may be annexed to the grant. The principle should not be extended. To include within its grasp the case of a warehouseman who has no privilege from the sovereign power, but simply builds his warehouse on the shores of a navigable stream and upon his own property, would be to overturn cases adjudged in this court and regarded as the law for many years past. The same is true of the owner of

an elevator who receives nothing from the State.   See Wet-
more *v.* Atlantic White Lead Co., 37 *Barb.* 70; Wetmore
*v.* Brooklyn Gas Light Co., 42 *N. Y.* 384.   In most of the
cases cited by the court in the Munn case, the right of limi-
tation springs from a license or privilege awarded by the
government, and this right of regulation or limitation is
engrafted on or inheres in such license as a condition of the
exercise of such privilege.   Thus, hackmen and cartmen
have the privilege to stand in the public streets in exercising
their calling, and the public has the right, in return for
such license, to demand their services on tender of proper
compensation.   The same is true as to ferries, which are
but parts of the highway.   Mayor *v.* Starin, 106 *N. Y.* 1;
and the right to establish them rested exclusively in the
crown, or, in this country, in the people.   Consequently,
when established in that way, the right of regulating or
limiting the tolls remained in the sovereignty granting the
license, and was exercised accordingly.

  The ancient right to regulate the toll which millers
should charge, rested on the right, at common law, which
the lord of the manor had to compel all his tenants to grind
their corn at his mill, and no one could set up a mill but by
his license or that of the crown, and with such license went
the right of regulation as to the tolls to be received.   See .
*Cooley on Const. Lim.* 735; 15 *Viner Abr.* 398, 399.   As
to the interest on money and the right to regulate it, it was
by the common law prohibited to any one to take any inter-
est for the use of money, and subsequently, when Parliament
altered the common law, it simply allowed interest to be
taken up to a certain percentage and upon certain terms.
*Tiedeman on Limitations of Police Power*, § 94.   All
the instances above cited are commented on in the very able
dissenting opinion of Mr. Justice FIELD in the Munn case
(concurred in by Mr. Justice STRONG), and the same reasons
for the exercise of the power to regulate these different
branches of business are therein stated in a much more full
and complete way than I have done.

As is said, there can be no legal objection to the power to direct the weight of a loaf of bread, for that is a mere police regulation, interfering with no man's real liberty, and it is the same as if the length of a yard were declared by law or the weight of a ton.    But I deny the right of any Legislature in this country to limit the price for which an individual baker shall sell his bread per loaf, or the price per ton for which a coal dealer shall sell his coal, or the price which a tailor shall charge for his coat, or the shoe-maker for his shoes.    A common carrier exercises, it has been stated, a kind of public office, and when a man devotes himself to such a calling, and holds himself out to the public as a common carrier, he thereby grants to the public such an interest in his business that each individual has the legal right to demand the carriage of his property by the carrier, upon payment or tender of a reasonable compensation for carriage in the absence of a legal regulation thereof. Allen *v.* Sackrider, 37 *N. Y.* 341.    He thus becomes a common carrier because of this dedication to the general public, and this legal right of the public to demand this service springs from such dedication.    The same is true of a public wharfinger or the keeper of a common inn.    They were all called "common" in their several occupations, and were common because they held themselves out as such to the public, and, as was said in some of the old books, entered into a general contract with the whole public to do the work, and hence arose the right of the public to call upon them to fulfill this contract.    No such right of access to the premises of defendants exists, and no such right to demand the use of their property can be, or, as I understand, is pretended.    But unless the innkeeper was the keeper of a common inn, or the carrier a common one, or the wharfinger was a public one, no matter what the extent of their business, or how large a number of the public were entertained by them, as the public had no right of resort to their premises or to demand transportation for or the care of their goods, or entertainment at their house, the right of regula-

tion did not exist as to the compensation they should receive. The cases are, as has been said, exceptions to the general rule, that no man can be compelled to have business relations with another. See *Tiedeman on Limitations of Police Power*, § 92, p. 226.

There is no satisfactory ground, in my judgment, upon which the power may be based to regulate or limit the price of transportation by a common carrier, or the price of entertainment by an innkeeper, who is a private individual and who has received no privileges from the State of any kind. To say that the carrier (while a private individual) holds a kind of public office, and, therefore, his prices should be limited, is not, as it seems to me, a very accurate description of his attitude to the public. He holds no office, public or private, within any fair meaning of such a word—and there is no reason, in justice or common sense, why his compensation should be limited by law, which would not hold good in the case of every individual dealing with the public, and holding himself out as ready, willing and eager to sell his goods to all comers.

The rule as to private individuals who happened to be common carriers or innkeepers, etc., was established in the earlier days of the law, and it was regarded by Lord Hale as most proper that individuals who followed such callings should be placed under State supervision and control. The habits, customs and general intelligence of the people of those days were far different from those of to-day; and laws which might possibly be pardoned on account of ignorance, sparseness of population, difficulties of communication and rural and unsettled habits of life, can have no such justification in our times.

It must be constantly borne in mind that in those days the theory of a paternal government which was to watch over and protect the individual at every moment, to dictate the quality of his food and the character of his clothes, his hours of labor, the amount of his wages, his attendance

upon church, and generally to care for him in private life, was almost at its height.

The famous statute of 5 Elizabeth, chapter 4, concerning laborers, was in full force when Lord HALE wrote. 6 *Lecky's England in the Eighteenth Century*, 233. That statute assumed to regulate the existence and determine the numbers of the artisans in the whole country. It provided how long one should work as an apprentice; how many there should be in proportion to journeymen; where they should live; under what circumstances move to another neighborhood; how many hours they should labor, and for how long a time a journeyman should be employed; and, finally, it provided that wages should be assessed for the year by the justices of the peace, who were also directed to settle all disputes between masters and apprentices. By an act of 1 James I. chapter 6, the above act was extended by giving to the justices power to fix the wages, not only of journeymen and apprentices, but of all kinds of laborers and workmen.

During this time, also, there were statutes making it a felony to export wool from England, and the exporter of sheep, rams, or lambs was liable to imprisonment, the forfeiture of all his property, and to have his left hand cut off for the first offense, and for the second offense to be adjudged a felon and to suffer death accordingly. See 8 Eliz. ch. 3; 13 & 14 Chas. 2, chap. 18. Provisions were extant forbidding exportation of hides, raw or tanned leather, and many other things, and all for the supposed benefit of the kingdom or the various interests in whose favor the legislation was enacted. *Smith's Wealth of Nations*, by McCulloch, p. 292 *et seq.* Laws were then in force which regulated down to the minutest detail the manner of life, and the texture of the dress and the costliness thereof, and the variety of dishes upon the tables of the people; special laws determined how much land of an estate should be plowed and how much left in pasture; how much was to surround a laborer's cottage; how many sheep

should be supported on a farm. 6 *Lecky's England in the Eighteenth Century*, 231, *et seq.*

In speaking of the above-mentioned statute of Elizabeth, the late Mr. W. Stanley Jevons, in his little work on "The State in Relation to Labor," in the English Citizen Series (at page 34), says, that it was a monstrous law, and that, according to the opinion of historians, it represented the triumph of the craft guilds,—that is, the medieval trade-unions,—and that in operation it was, there is reason to believe, little more than a dead letter. In the same work the author says, that the justification of State interference in matters of private concern, as in the inspection of certain kinds of food, etc., lies in the fact that government may properly interfere to prevent abuses in those special cases where it is impossible, or at least difficult, for the buyer of goods to verify their character for himself. Inspection of factories is justifiable for the purpose of thereby protecting the health and morals of large masses of the people who labor in them, and who, as experience has shown, are unable to protect themselves. The work is a most able treatment of the question as to how far it is proper to interfere in the general industrial department of the country. It is needless to say that such a law as is under consideration here, does not fall under any of the conditions in which State interference is regarded as proper.

But it was during the times when laws such as I have above alluded to were in force that Lord HALE lived and wrote. He was, without doubt, a very great lawyer, but he wrote regarding the law as it then existed, and when views of governmental interference with the private concerns of individuals were carried to the greatest extent; and he was naturally and necessarily affected by the atmosphere of the times in which he lived ; and his views as to the policy and propriety of laws involving an interference with the private concerns of the subject, were, of course, colored by the general ideas as to the proper function of government then existing. This great magistrate, it will be remembered,

was a firm believer in the existence of witchcraft, and pre-
sided at the trials of old women accused of such crime, and
condemned them to death on conviction thereof. I do not
mention this as any evidence against the ability, integrity
or learning of this upright man and able lawyer; but it is
entirely conclusive of the truth of the statement that all
men, however great and however honest are almost neces-
sarily affected by the general belief of their times, and that
Lord HALE was not one of the few exceptions to this rule.
I have spoken thus somewhat at length upon this subject,
not for the purpose of attempting to show the incorrectness
of the rule laid down by Lord HALE regarding common
carriers, innkeepers, wharfingers, etc., who were, at the
same time, nothing but private individuals, having no privi-
lege from the State; but I have thus spoken for the pur-
pose of showing that, because the rule is correctly stated in
those cases, no reason exists in such fact for the extension
of the principle of that rule to other cases, and, by doing so,
go back to the seventeenth, or eighteenth century ideas of
paternal government, and thereby wholly ignore the later,
and, as we firmly believe, the more correct ideas which an
increase of civilization and a fuller knowledge of the funda-
mental laws of political economy, and a truer conception of
the proper functions of government have given us at the
present day. Rights which we would now regard as
secured to us by our bill of rights against all assaults, from
whatever quarter, were in those days regarded as the proper
subjects of legislative interference and suppression. The
fact that certain rules of the common law have come down
to us unimpaired, although based upon a view of the re-
lations of government to the people which obtained in the
seventeenth century, should certainly furnish no reason for
extending those rules to cases which, but for such exten-
sion, would be regarded as clearly within the protection of
the constitutional limitations contained in our bill of
rights. I think that no further violation of the general
rule of absolute liberty of the individual to contract re-

garding his own property, should be sustained by this court. This violation would have to occur if we should hold legislation of the kind under consideration, valid.

Tiedeman, in his work already cited, at the end of section 93, on page 238, in speaking of Lord HALE and his observations, and generally in regard to this power, says: "Lord HALE, therefore, cannot be cited in support of the doctrine that the State may regulate the prices charged in a business which, from the circumstances, becomes a virtual monopoly. And even if he did justify such regulations, his opinion can hardly be set up in opposition to the rational prohibitions of the American Constitution. By all the known rules of constitutional construction, the conclusion must be reached that the regulation of prices in such a case is unconstitutional; and while the common law is still authority for the propriety and justification of laws which antedate the American Constitution, it cannot be cited to defeat the plain meaning of the Constitution in respect to laws subsequently enacted." See, also, same author, p. 588.

Judge COOLEY, in his Constitutional Limitations (5th Ed.), at page 739, gives four heads under which such regulations are admissible, and such a case as this comes under none of them. He says, in summarizing his own views as to when the property of the citizen could be said to be affected with a public use or interest, so that prices might be limited, that they were in four classes: (1) When the business is one, the following of which is not of right, but is permitted by the State as a privilege or franchise; and under this head he includes such cases as lotteries, giving shows, keeping billiard tables for hire, etc. (2) Where the State, on public grounds, renders to the business special assistance by taxation or otherwise. (3) Where, for the accommodation of business, some special use is allowed to be made of public property or of a public easement. (4) Where exclusive privileges are granted in consideration of some special return to be made to the public. Possibly, he says, there may be other cases. He does not include

such a case as this or the Munn case, though the latter was under criticism in this very definition.

That learned author, in speaking on this same subject, says, in same volume, pages 737, 738, 739 ; " What circumstances shall affect property with a public interest is not very clear ; the mere fact that the public have an interest in the existence of the business, and are accommodated by it, cannot be sufficient, for that would subject the stock of the merchant and his charges to public regulation. The public have an interest in every business in which an individual offers his wares, his merchandise, his services or his accommodations to the public; but his offer does not place him at the mercy of the public in respect to charges and prices. If one is permitted to take upon himself a public employment, with special privileges, which only the State can confer on him, the case is clear enough," etc.

The case put by Lord HALE, of the owner of a private wharf, which was the only one in a new port, being properly subjected to a limitation of his charges, because of an alleged monopoly, is spoken of by COOLEY, and explained as grounded upon the use of public property under a license, as the title to the soil under the water in navigable streams is in the sovereign, and its use by a private person upon which to build a wharf is under the license of the crown.

Judge COOLEY then says, at page 739 of his Constitutional Limitations, as follows : "If, then, by public permission, one is making use of the public property, and he claims to be the only one with whom the public can deal in respect to the use of that property, it seems entirely reasonable that his business is affected with a public interest which requires him to deal with the public on reasonable terms."

The right arises from the use of the property of the public by the license of public, or, in other words, by the license of the crown, and thus the right of limitation attaches to such user. It does not spring from any assumed monopoly arising simply from convenience of location, or

because no others are engaged in the business, but only because of the user of public property by the license of the crown or the people.

There is not the slightest proof in this case that the warehouse is built below low-water mark in the East River, on the Brooklyn side, and so on land the title to which may be in the State. If it be thus built, then, perhaps, the State could compel its removal; but it has done or attempted nothing of the kind, and does not seek to do it by this legislation, nor is there any pretense of the limitation of price being placed as a condition of the continued user of the land by the owner of the warehouse. There is no grant of any right by the State, nor of any privilege or franchise, upon which to base a claim of the power to limit the price for the user of the warehouse.

Both these able writers, whom I have quoted, are plainly of the opinion that the Munn case cannot be upheld as within any branch of the police power, as that power is limited under our constitutional government; and I think that, notwithstanding the great respect which is entertained for the Federal Supreme Court, the doctrines of the Munn case have never received the unqualified approval of the profession. I think, in order to follow it in these cases, we should have to overturn cases and principles decided in this State, after mature deliberation and upon the most impregnable grounds.

The Munn case was published in 16 *American Law Register* (*N. S.*) 526, in 1877. A note is added, at the end of the report, which is entirely adverse to the doctrines of the case, and it is stated that no other court had ever held that a warehouse, situated as was that of the plaintiff in error in that case, was private property which was affected with a public use. A private individual's property was supposed to be affected by a public use, as stated in the note above referred to, when the public had a somewhat greater of less proprietary right therein, aa in a public stream over which a person established a ferry, or in the right to a

fishery, etc.; and the right to regulate the business of a common carrier it was thought might be placed on the ground of the use the carrier made of a public highway, maintained more or less directly by the taxation of the public.

Commenting on the Munn case, it is said, in 2 Hare's American Constitutional Law, 771: "Such legislation may be eminently just as regards companies which have been chartered by the State or clothed with the power of eminent domain, because grants of this description not infrequently preclude the competition which is the security against overcharge in trade, but seems questionable when the way is left open to individual enterprise," etc.

There is some evidence, also, that the decision in the Munn case has not been accepted without criticism by lawyers, even in the land from which we derive our common law, upon the principles of which the learned chief justice claimed to rest it. Mr. Bryce, one of the most accomplished of English lawyers and statesmen, and the author of the late great work on "The American Commonwealth," thinks that the decision was, perhaps, more the effect of public opinion in its action upon the court than of a strict adherence to legal principles; and while, as he says, not presuming to question its correctness, yet adds that it evidently represents a different view of the sacredness of private rights, and of the powers of the Legislature, from that entertained by Chief Justice MARSHALL and his associates. See 1 *Bryce's American Commonwealths*, 2 vol. ed., p. 267; 3 vol. ed., p. 365.

Upon the question of what is meant by the expressions public use and virtual monopoly, when found in the cases upon the subject under consideration, that of Allnutt *v.* Inglis, as Treasurer, etc. of London Dock Company (12 *East*, 527), is a most instructive one. The defendants were the owners of certain London docks, and they had received from Parliament the right to store foreign wines in their warehouses connected with such docks, in bond, until their

sale and the payment of duties thereon.    This license was, at that time, exclusive, as none but the owners of these docks had the right to receive the wines on storage.    This gave the importers of such wines the legal right to resort to the docks and warehouses for unloading and storing, and hence the court held that their owners had devoted them to a public use.    The court said that "if the crown should thereafter think it advisable to extend the privilege" (of warehousing these foreign wines in bond) "more generally to other persons and places, so far as that the public will not be restrained from exercising a choice of warehouses for the purpose, the company may be enfranchised from the restriction which attaches upon a monopoly," etc.    And ELLENBOROUGH, Ch. J., said there is no doubt that the general principle is favored, both in law and justice, that every man may fix what price he pleases upon his own property ; or the use of it ; but if for a particular purpose, *the public have a right to resort to his premises and make use of them, and he have a monopoly in them for that purpose ;* if he will take the benefit of that monopoly, he must, as an equivalent, perform the duty attached to it on reasonable terms. It is seen that this was a case where Parliament, in the first place, granted a monopoly, and, as a consequence of an acceptance thereof by defendants, the public had a right to resort to the warehouse for the purpose of storing the wines in bond ; and, by thus accepting the monopoly, the defendants dedicated their property to a *quasi* public use, because the public, by virtue of such monopoly and for such purpose, had the right to resort to their warehouses and to demand the storage of the wines.

The facts of the case must be taken into account whenever expressions are used of a somewhat general nature; and it is evident that when the English judges and courts spoke of an owner of property devoting it to public use, or one in which the public had an interest, they meant that by reason of such devotion the public thereafter had a right to resort to the place where the property was, and a legal right.

to demand its use on payment of a reasonable compensation. And the cases they were discussing, and in which they made use of the term " virtual monopoly," and where they held the owners had devoted their property to a public use, were cases where such owners were receiving from the government some special privilege or franchise by accepting which they did thereby so devote their property.   Unless the public had that right of resort and that right of user upon payment of such compensation, there was no devotion of the property to a public use within the meaning of this expression, which, *ex vi termini*, means a devotion to the public use to such an extent that the public thereby has a legal right to resort to the premises and to demand such use upon payment or tender of reasonable compensation.

The case of Belt *v.* Stanett, 8 *Durnf. & East*, 606, is an illustration of the same principle.   The crane was set up by its owners on a public quay (either by the express or implied license of the government) to which the public had the right to resort for the purpose of loading and unloading vessels, and, being so set up and under such circumstances that the public had the right to make use of it, the compensation therefor was properly limited to a reasonable sum.

In this State neither the amount of work done by the owner for the public in the use of his property, nor the numbers of the public who use it, nor the convenience of situation of the property, nor all combined, make the use a public one within the meaning of the term as used in this discussion.   Where the owner of property holds himself out to the public as the common servitor thereof, as in the case of a common carrier or innkeeper or wharfinger (which, as I have said, are ancient exceptions to the general rule), or where he has received some privilege or franchise from the government, then he has granted to the public an interest in his property as to its use, or he accepts the privilege or franchise upon such conditions as the government may annex to its exercise.   And when he opens his premises to and invites the public generally to repair to them for the

purpose of a resort for some kind of public entertainment or amusement, then he, for the time being at least, brings such property within the exercise of the police power as applied to regulations for the public health or morals, as in the late case of People *v.* King in this court (110 *N. Y.* 418) already cited. Even the law, referred to in the King case, made no provision as to the amount of compensation to be demanded for entrance to the premises.

The decision in the Munn case entirely changed the common-law character of the warehouses or elevators, and transformed the business from a private to a public one, and this transformation was held to have taken place simply because of the extent of the user of the property and the convenience of situation. The change being effected, the right to demand the services of the plaintiffs in error was assumed without argument; and such right existing, the right to limit the change was evolved therefrom. The fact that the owners of the property had received no license or privilege from the State, had been endowed with no legal monopoly, virtual or otherwise, were neither common carriers nor public wharfingers, and were simply using their private property in a business which, in its real nature, was as strictly private as that of the large houses of A. T. Stewart, Claflin & Co., and hundreds of other large firms in New York and elsewhere, had no effect with the court in determining this question of public use. The business was placed on the same foundation as a common carrier, and the right of the public to compel business relations was assumed. I am confident that the courts of this State have never gone to any such length in determining when property is devoted or dedicated to a public use.

What is alluded to in the books as a monopoly or as a "virtual" monopoly, is, in either case, a right created by license from the crown or by virtue of an act of Parliament. See 4 *Blacks. Comm.* 159; 4 *Stephens Comm.* 291. The important fact is that it emanates from the sovereign power either by license or by legislation, and in both cases, either

as an exclusive or a virtual monopoly, it is a privilege or immunity granted to an individual or corporation, and, of course, upon such conditions as to compensation, etc., as the licensing power may choose to impose. Thus in the case in 12 *East* (*supra*), it was stated that the dock owners would have had a virtual monopoly of the storage business if the choice of the public as to where to store its wines were so far restricted, by the government licensing only a few, that its freedom of choice practically did not exist; but that if the license should so far become general that there was practically a fair freedom of choice, then there would be no monopoly, and the owners of the warehouses would be free to charge such rates as might be agreed upon.

It was no where stated or implied that there could be an exclusive or a virtual monopoly grounded on the fact of convenience of situation, or the costliness of the erections, or a mere combination of owners to raise prices. Such combinations might be illegal, and they might subject the persons who entered into them to prosecution as violators of the law, but that would confer no right to regulate or limit the amount of compensation which a private individual might charge for the use of his property where he had not devoted it to a public use, as I understand the meaning of that term, and where he had not recived any privilege or immunity from the State upon the exercise of which the right of limitation might be imposed. The virtual monopoly, in the case in East, rested wholly upon the grant of the privilege of bonding given by the crown.

Finally, and much later than the Munn case, the Supreme Court, in defining just what it did decide in that case, said (per Mr. Justice MILLER) that the Munn case presented the question whether one engaged in a public business in which *all the public had a right to require his service*, could be regulated by acts of the Legislature in the exercise of this public function and public duty, so far as to limit the amount of charges that should be made for such services, and the court answered such question in the affirmative.

See Wabash R. R. Co. *v.* Illinois, 118 *U. S.* 557, 569. The court seems, therefore, to have assumed in the later case that the Chicago elevator owners were bound to place their elevators at the service of the public upon demand, and could not, so long as they remained in the business, refuse to do the business required of them, and that the Munn case simply decided that principle. The elevators were made public, not by the Constitution or laws of Illinois, but by the facts of that case.

The Slaughter-house Cases, 16 *Wall.* 36, decided that the act of the Louisiana Legislature, although granting an exclusive right or privilege as to the slaughtering of cattle, and designating the place for it, was yet valid as a police regulation as to such business, and came under the description of a health regulation, and did not violate any provision of the Federal Constitution. But if the mere extent of the use of one's property by the public in the particular business in which he is engaged, is to stamp that use as a public one, and if he is, therefore, to be held to have devoted his property to a public use, the power of the Legislature may be imposed upon a vast number of employments which have heretofore been regarded as wholly private, although at the same time very extensive.

A man may set up scales for weighing merchandise by the wholesale upon his own lands, and announce his readiness to weigh the merchandise of all comers upon such terms as they may agree as to compensation. As soon as his business reaches proportions large enough to enable the Legislature, in its discretion, to declare that he has devoted his property to a public use, that moment it is clothed with the power to limit him in his compensation for the use of his own property. It is in vain for him to say that he has asked and received nothing from the State by way of any special privilege or right, and that he has a right to charge what he will for the use of his own property, and the public has no right to demand his services; the answer would be, you have devoted your property to a public use because

People *ex rel.* Annan *v.* Walsh.

great numbers of the public desire to and do use your property for the purpose that you have offered it, and it is entirely immaterial that the public has no legal right to demand such use. As long as you are in the business you must submit to be regulated by the power of the State.

If a man should erect on his own land a large steam mill to grind corn, and, by reason of his superior facilities, large numbers of persons should resort to it for the purpose of having their corn ground, has he devoted his property to a public use because of the extent to which the public make use of his property for the purpose for which he erected or fitted it up? So long as no person has the right to make use of such property against the will of the owner, and so long as he neither exercises nor receives any special privilege from the State, can it be plausibly maintained in this State that it can impose upon him a limitation as to the amount which he is to receive for the use of his own property?

Nothing like this question was discussed or decided in Township *v.* Beasley, 94 *U. S.* 310, as the only controversy there existing was whether the particular purpose for which the bonds were in that case issued was covered by the Kansas enabling statute. The validity of that statute was not discussed or decided. But there are some States were a riparian owner has been given the right to build dams for the purpose of running mills by water-power, and to overflow thereby the lands of others, upon payment of the damage done, and it has been held that the overflowing of the land was for a public purposes, *i.e.*, for a mill, and that it might be done under the authority of the Legislature upon due compensation being made. Many of such statutes are set forth in the note to the very learned opinion of Mr. Justice GRAY, in Head *v.* Amoskeag, etc. Co., 113 *U. S.* 9, in which case it was held by the Federal court that such a statute violated no clause of the Federal Constitution; but the act was upheld in that court, not as a proper exercise of the right of eminent domain, as taking property for a

public use, and it was considered as one regulating the manner in which the rights of proprietors of lands adjacent to a stream may be asserted and enjoyed.

· This court has never gone to any such length, however, in determining what was a public use, within the taxing power or within that of eminent domain.   In Hay *v.* Cohoes Co., 3 *Barb.* 42, 47, it was stated that no exercise of any such assumed right (that of eminent domain) had ever been attempted by our Legislature in favor of mills of any kind, and it was said that sites for steam-engines, hotels, churches and other public conveniences might as well be taken by its exercise.

In Weismer *v.* Village of Douglass (64 *N. Y.* 91), which was substantially a mill case, where the defendant was authorized to issue its bonds to raise money to pay a subscription to a corporation which was expected to run a saw-mill on the Delaware River, this court held that the bonds were not issued for a public purpose, and the property of individuals could not be taxed to raise money to pay the principal or interest on such bonds.   The purpose was declared not to be a public purpose, because (among other reasons) the public had no right to go to the mill of the corporation, when completed, and demand the right to have logs sawed into lumber there.   As the corporation could refuse, at any and at all times, to saw the lumber for any particular person, or for all persons, the business of building or running the mill was not a public purpose or use; and, of course, property thus used was not devoted to a public use, and taxation for it was illegal.   And *In re* Application of Eureka Basin, etc. Company of Long Island, 96 *N. Y.* 42, the company was organized to (among other things) acquire certain swamp lands and erect thereon basins, docks, wharves and piers, and warehouses for storing goods from vessels, etc., and it desired to obtain certain lands by the exercise of the power of eminent domain, upon the assertion that the use contemplated was a public one. This court held that as the public did not have the right to

People *ex rel.* Annan *v.* Walsh.

use the warehouses, or to direct, in any way, their manage-
ment, and the property remained under private ownership,
it was not a public use to which it was to be put, and hence
no right existed to exercise the power asked for. The court
said : " The fact that the use to which the property is in-
tended to be put, or the structure intended to be built
thereon, will tend, incidentally, to benefit the public by
affording additional accommodations for business, commerce
or manufactures, is not sufficient to bring the case within
the operation of the right of eminent domain, so long as
they are to remain under private ownership and control,
and no right to their use or to direct their management is
conferred upon the public."

These two cases, in our own courts, illustrate the matter
of a public use when that term has been employed with ref-
erence to the two great powers of taxation and eminent
domain, and they show that, in circumstances such as
therein stated, the fact that the public had no legal right to
resort to the premises and to demand the use of the owner's
property, on payment of reasonable compensation, was fatal
to the claim that such use was of a public nature, or that
the property was in such case devoted to a public use.
There is no distinction of principle between the cases ; and
whenever it has been claimed heretofore that property has
been devoted to a public use, the term has expressed the
fact which existed ; that the public had a right to resort to
the premises and to use the property, or to demand trans-
portation, etc., upon reasonable compensation being paid or
tendered. And the case of a steam mill, which I have in-
stanced, would not in this State be regarded as in the least
degree a property which was devoted to any public use
whatever, although its presence might greatly tend to bene-
fit and accommodate the public.

The same principle has been decided in Vermont in
Tyler *v.* Beacher, 44 *Vt.* 648, and the opinion of Mr.
Justice WHEELER is referred to as a very able examination
of the subject of what is a public use. If the power were

as broad as is sometimes claimed, so that every sovereignty might regulate the conduct of its citizens towards each other in this way, when necessary for what the Legislature should determine to be the public good, and could regulate the manner in which each person should use his property, to the extent of making this limitation, then the whole power of legislation rests with the legislative department unrestrained by any constitutional prohibition; and it is but necessary for the Legislature to decide that its proposed enactment is for the public good and general welfare, and such decision stands as a conclusive reason for and justification of its action. This cannot be and is not true. There are limitations to this doctrine other than the mere will of the Legislature and its decision as to what constitutes the public good or the general welfare; these limitations are to be found in our fundamental law, and have been frequently discussed; and limitations have been placed upon the exercise of such power by the decisions of this court in carrying out the provisions of the Constitution. For example, see Wynehamer v. People, 13 *N. Y.* 378; *In re* Jacobs, 98 *N. Y.* 98; 2 *N. Y. Crim. Rep.* 539; People v. Marx, 99 *N. Y.* 377; 3 *N. Y. Crim. Rep.* 200; People v. Gillson, 109 *N. Y.* 389.

The clause in our Constitution that no person shall be deprived of life, liberty or property without due process of law (Const. art. 1, sec. 6), is to have a large and liberal interpretation, as this court has said in so many words, and as is evidenced by the above cited and other cases. The citizen is thereby protected against any unlawful invasion of such rights or of any essential incident to the enjoyment thereof. Many instances of the benefits of this provision are cited in those cases, and in the dissenting opinion of Mr. Justice FIELD in the Munn case, which, it seems to me, is a most masterly examination and clear statement of the principles which I believe this State has always stood by, and protected through its courts.

These cases hold that the liberty mentioned in the bill

of rights is not the mere right to be free from personal restraint; it includes a right to labor and to receive the fruits of one's labor (which includes the price for the use of one's property), in all ways which are not harmful to the welfare, the health, the happiness of others. The whole reason for the existence of the police power rests in the theory that one shall so use his own property as not to interfere with the proper use by others of their property, and so as not to interfere with the public health, morals or general welfare. The last words do not give power to the Legislature, arbitrarily, to determine the question what is for the general welfare; but such power is subject to the constitutional restrictions already adverted to, beyond or in violation of which the Legislature cannot go.

The case of Vanderbilt *v.* Adams, 7 *Cow.* 349, was decided by our Supreme Court in the early part of the century. The facts show a clear case for the exercise of the authority claimed under the of the Legislature providing for the regulation of the harbor of New York. The plaintiff was the owner of a private wharf, such a one, I assume, as is spoken of in the cases of Langdon *v.* Mayor, 93 *N. Y.* 129, and Williams *v.* Mayor, 105 *Id.* 419, as I know of no other kind of private wharf in New York. It was held that the wharf was subject to the harbor regulations contained in the legislative act, because such regulations were merely an exercise of the police power necessary to prevent confusion and to promote the peace and good order necessary to be observed in a crowded harbor, such as New York was even then regarded. It was held that the city had never, by its grant of the land under water, or of the right to build a wharf, parted with the right which it had received under its charter over the subject-matter of the wharves and their regulation.

The difference of title of shore-owners on the New York and Brooklyn sides of the East River is discussed in Wetmore *v.* Atlantic White Lead Co., 37 *Barb.* 70, and referred to and recognized in the case of same plaintiff against

Brooklyn Gas Co., 42 *N. Y.* 393. And it was distinctly stated in last cited case that the State did not, by its former acts, grant any right or privilege or franchise to the owners of the land under water, upon which could be based the right to compel the owner of the land to consent to its use by the public.

The License Cases, 5 *How.* 504, 583, decided only that regulations for the sale of intoxicating liquors were valid and did not infringe any provision of the Federal Constitution. TANEY, Ch. J., in speaking of the police power of the State, simply said that it was of the same class as any other power inherent in every sovereignty. There was no pretense of a claim that it was a sovereign power uncontrolled and unlimited by the clauses of the Constitution providing for the liberty of the citizen. When the State legislates, it does so by virtue of the power of sovereignty, which is, as the learned chief justice said, the power to govern men and things within the limits of its dominion.

It has been frequently said that the police power rests for its foundation upon the general duty of each citizen to so use his property as not to interfere with the fair and proper use by his neighbor of his property, and to protect and guard the public health and morals. The power to regulate or limit the price for the use of property situated like that in this case comes within no fair definition of such power, nor does it belong to the category of things that should be regulated in order that another may properly enjoy his own property, or that the public health or morals may be protected.

An examination of the cases now before us, in view of these observations, will show, as I think, that these defendants have never devoted their property to a public use, so that the public had a right to require their service, and that they have received no immunity or privilege from the State upon which this claimed right of limitation can be imposed as a condition to its exercise.

These defendants are the owners or lessees of certain

elevators or warehouses, used in the harbor of New York for the purpose of transferring grain from one vessel to another, from a canal-boat to a steamship, from boat to rail car, or for the storing of grain. They are not a corporation, nor have they received any special privilege from the State in regard to their business, nor are they engaged in a business which is not absolutely free to any one who wishes to use his property in the same way. They have no special right to use the waters within the jurisdiction of the State in a manner not equally open to every citizen, not only of the State but of the United States. The State furnishes them no special facilities for the carrying on of their business, and they are under no obligations to it for any protection to their business or property, other than such as is given by and is due from the State to all the inhabitants thereof, viz., the duty of protection to their persons and property while they are lawfully engaged in their occupations. They are under no legal duty to engage in such occupation for all who may come and ask them. They have the perfect right to refuse to elevate, by means of their elevators, a bushel of grain for A., and, at the same time, they have the right to use such elevators to elevate the grain of B. They have the equal right to refuse to store the grain of any or of all persons. I fail entirely to see how such a business can be said to be one in which the public have an interest in the way of a right to limit, through legislation, the price for which such business shall be done.

The defendants are situated entirely different from the elevator owners in Chicago, whose rights were adjudicated upon in the Munn case. The canal-boats loaded with grain, after their passage down the Hudson River, seek the owners of the storehouse in which to store the same until wanted, or the floating elevator is sought for and found, and employed to unload the cargo of the boat into the hold of the steamship. There are large numbers of warehouses and elevators which are in no way connected with each

other. In neither case is there anything like what can be called a monopoly, virtual or otherwise; the utmost stretch of the imagination cannot so regard it. The warehouses are private property, and no one can enter upon them without the consent of their owners. Wetmore *v.* Atlantic White Lead Co., 37 *Barb.* 70; Wetmore *v.* Brooklyn Gas-Light Co., 42 *N. Y.* 384.

Still more plainly is this the case with a floating elevator. It is not a common carrier or wharfinger or warehouse-man. It has no monopoly, virtual or otherwise, as to facilities of place, convenience of situation, or license or privilege from the State. In the nature of the business of both the warehouseman and the elevator owner it is wholly private. Now, in what is the case made less strong when, instead of the scales or the mill, heretofore instanced, an elevator or warehouse is substituted? It is built by individuals or private partnerships, and occupied by them or leased to other private individuals or partnerships. It is built on lands owned by individuals, or it is in the substantial form of a boat, and floats on the public waters of the State, and its owners have received no kind of license, privilege or immunity from the State, in any way special in its nature, or which is not common to all the people of the State. How, then, has the owner devoted it to a public use? It is claimed that he has done so because the elevator or warehouse is to be used to elevate or store a vast amount of grain which comes from the West seeking transportation through the Erie Canal; and because it costs a large amount of money to build such structures, and owing to the facility and cheapness with which the elevator does the work, as compared with the labor of individuals, those who own the grain, or those who are interested in its transportation, are compelled to use such elevator if they desire to successfully compete in the business of transportation and in loading or unloading of such grain. Hence, it is said, a virtual monopoly exists, and the persons who own it are under the regulating power of the Legislature as to their compensation.

People *ex rel.* Annan *v.* Walsh.

But I deny that there is any virtual monopoly. There was such in the case in 12 *East* (*supra*), because there was no right in any other owners of warehouses to receive the wines on storage, and the right existed in the dock owners by virtue of a special grant from the sovereign. A monopoly in a business, where the persons engaged in it have no exclusive privilege, and into which business the whole world is at liberty to enter, and upon entering which they will be possessed of precisely the same rights and privileges as the others engaged in it, is a contradiction in terms. Loosely speaking, a person or corporation is said to have a virtual monopoly of a business when, on account of its great extent and the facilities it has for transacting it, arising from its large proportions, the article it manufactures or sells substantially takes possession of the market. Such, for instance, is the case in the manufacture and sale of matches. One company does an enormous business, and has almost what is called a monopoly in some parts of the country arising not from any special privilege or right granted to or exercised by it, but because of its facilities; and it is, therefore, enabled to make the article cheaper and sell it cheaper than its competitors. But would any one suggest that the State has, therefore, a right to limit the price which the company shall charge for matches? If it be a corporation, indeed, or if it has received any special privilege or right from the State, then conditions may be imposed upon it, although none can be simply because of the greatness of its sales or the number of the public interested in procuring cheap matches.

But when the right of regulation as to compensation is spoken of because the person has a virtual monopoly, the term has heretofore been used as indicative of some special privilege or franchise granted to the individual by the sovereign which results in such virtual monopoly, and the right of such regulation exists by reason of such grant. No monopoly of that kind exists in this case. If it be said that the effect is the same, the answer is that it is not the same.

In the one case the monopoly exists by reason of the action of the government, and no other citizen can come in and devote his capital and energy to such use. In the other the monopoly exists only as long as other citizens choose to keep out of the business, and just as soon as it is seen that the least degree over the ordinary profit can be realized by an investment in elevator property just that moment capital will flow into that channel, and probably away from some industry where the average rate of profit has ceased to be made. Thus, in one case, the result cannot be avoided or in any way altered excepting by the action of the sovereign, while in the other case it may be altered by the action of the ordinary laws of trade. The effect, while it lasts, may possibly be the same in both cases, but in the one it is arbitrary and dependent upon the government, and in the other subject to alteration according to general commercial rules. But in this case there is no pretense of a monopoly grounded upon lack of ability in the public to compete. On the contrary, the complaint is that the competition has been so fierce and the numbers of those engaged in the business so great that that they have combined to fix upon prices below which they would not work, and it is, in reality, the combination of which complaint is made. If the prices for doing the work are higher than is reasonable, owing to such combination, the combination itself may be illegal (see Hooker *v.* Vandewater, 4 *Den.* 349; Stanton *v.* Allen, 5 *Id.* 435); and, as has been said, the persons engaged in it may render themselves amenable to the criminal laws of the State, but no power of the State to limit the price for which a person may sell his property, or the use of it, results from a violation of the law against conspiracies or combinations to raise illegally the prices of articles or the charges for services which have a commercial value.

It is said, however, that the defendants have received some privileges or benefits from the State in their business of elevating or storing grain, because the State has built the Erie Canal and spent large sums of money for that purpose,

People *ex rel.* Annan *v.* Walsh.

and the business of elevating grain into and out of a canal-boat, or of storing it, is made much greater than would be possible but for the constant maintenance of the canal by the State ; and if the State should cease to maintain the canal the business of transporting grain over it would be wholly destroyed, and, therefore, it must be conceded that the business of elevating grain receives support from the public, and it is only through such support that the business can exist. It is difficult, as it seems to me, to regard this argument seriously. The State, it is thus said, has built a canal, and there are men (not the defendants) who propose to avail themselves of its existence, add to transport merchandise in their boats over its waters. Before undertaking such transportation, however, they must load their boats or unload them after such transportation is finished, and in the process of loading or unloading their boats in the public waters of the State they hire the defendants to do the elevating of the cargo. If the canal had not been built there would have been no boatmen with canal-boats asking for cargoes, and, consequently, the defendants would not have had the opportunity of loading their vessels ; therefore, the State has conferred a privilege upon the defendants by using which they acquiesce in the right of the State to limit the amount of compensation they can lawfully demand for the use of their own property. The mere statement of the proposition, it seems to me, is its best refutation. To argue upon it would seem to admit that it is debatable. By reason of the action of the State in building the canal, more frequent opportunities have arisen from which the defendants have been enabled to engage in a certain kind of labor and to invest their capital in certain kinds of property, but not a privilege, immunity or franchise of any description has the State granted to them even by the loosest construction of language.

The legislation in question is nothing else than an effort, not only to regulate the private business of private individuals, but to limit the amount for which they shall exact

compensation for the use of their own property, in which the public has no interest whatever, in the legal meaning of that term.    If it is legal in this case, it is legal in any.    The Legislature can step in and limit the prices of every article of commerce, the product of the field, the mine or the manufactory.    There is seemingly no length to which it may not go, and no home to which this power may not be applied in matters of the most individual and private nature, and all under the guise of legislation for the public good and the general welfare.

It is true that the question of the validity of this law is one of power and not of propriety ; and if the Legislature, in any case, may have, under any circumstances, the power to limit the compensation which a private individual may receive for the use of his own property, not devoted to a public use and in regard to which he receives and exercises no special privilege or immunity from the State, then we are bound to suppose such circumstances to exist in the case before the court.    We are of the opinion that the Legislature has no such power.

There is no foundation for the argument that the elevator owners have a monopoly because they have their charges fixed by the Produce Exchange, which only recognizes as *regular* the warehouse receipts given by elevator owners or warehousemen who are members of that body. If that be the fact, it constitutes in no view of the subject a monopoly.    What has already been said upon the subject applies in equal degree to such an argument; nor have the defendants thereby received any privilege or franchise from the State.

The disposition of Legislatures to interfere in the ordinary concerns of the individual, as evidenced by the laws enacted by Parliaments and Legislatures from the earliest times, and the futility of such interference to accomplish the purposes intended, have been the subject of remark by some of the ablest of English-speaking observers.    Buckle, in his "History of Civilization in England," in speaking

of the course of English legislation, says : " Every great reform which has been effected, has consisted, not in doing something new, but in undoing something old. The most valuable additions made to legislation have been enactments destructive of preceding legislation, and the best laws which have been passed have been those by which some former laws have been repealed." And again : " We find laws to regulate wages; laws to regulate prices; laws to regulate profits ; laws to regulate the interest of money ; custom-house arrangements of the most vexatious kind, aided by a complicated scheme, which was well called the sliding scale, a scheme of such perverse ingenuity that the duties constantly varied on the same article, and no man could calculate beforehand what he would have to pay. A system was organized, and strictly enforced, of interference with markets, interference with manufacturers, interference with machinery, interference even with shops. In other words, the industrious classes were robbed in order that industry might thrive." ` 1 *Buckle History of Civilization in England*, 199, 200, etc.

The legislation under review is of the same general nature. To uphold legislation of this character is to provide the most frequent opportunity for arraying class against class; and, in addition to the ordinary competition that exists throughout all industries, a new competition will be introduced, that of competition for the possession of the government, so that legislative aid may be given to the class in possession thereof in its contests with rival classes or interests in all sections and corners of the industrial world. We shall have a recurrence of legislation which, it has been supposed, had been outgrown, not only as illegal, but as wholly useless for any good effect, and only powerful for evil. Contests of such a nature are productive only of harm. The only safety for all is to uphold, in their full vigor, the healthful restrictions of our Constitution, which provide for the liberty of the citizen, and erect a safeguard against legislative encroachments thereon, whether exerted

to-day in favor of what is termed the laboring interests, or to-morrow in favor of the capitalists. Both classes are under its protection, and neither can interfere with the liberty of the citizen without a violation of the fundamental law.

In my opinion, the court should not strain after holding such species of legislation constitutional. It is so plain an effort to interfere with what seems to me the most sacred rights of property and the individual liberty of contract that no special intendment in its favor should be indulged in. It will not, as seems to me plain, even achieve the purposes of its authors. I believe it vain to suppose that it can be other than of the most ephemeral nature at its best, or that it will have any real virtue in altering the general laws of trade, while, on the other hand, it may ruin or very greatly impair the value of the property of wholly innocent persons. If the compensation limited by the act is not sufficient to permit the average rate of profit upon the capital invested, it will result either in its evasion, or else the work will not be done, and the capital employed will seek other channels where such average rate can be realized, or the property will become of little or no value. If the compensation be sufficient, the same result aimed at would soon follow from the general laws of trade, from the law of supply and demand, and the general cost of labor and materials.

Every one having the same right to build an elevator or warehouse that these defendants have, and, upon its completion, to employ it in the same business, if the rate of profit is above the average, capital, if allowed absolute freedom and legal protection, will flow into the business until there is enough invested to do all or more than all the work offered, and then, by the competition of capital, the rate of compensation would come down to the average. Such, at least, would be the tendency, and it could only be averted by combination among the owners of the property, which could not be long sustained in the face of perfect freedom to all to invest in such undertakings. That they are expensive,

and require the outlay of a large amount of money to build and maintain them, and that the warehouses now existing may have an advantage in location, does not, as has been shown, make them a monopoly, but simply tends to make the inevitable result a trifle more slow in its approach than in other cases requiring a smaller outlay. If it be said that there is already a superabundance of elevators, more than can be or are used, and that some of them lie idle while others do the work, and they all share in the profit; if the profit exceed what the owners of the grain or those engaged in its transportation can afford to pay, the result will then be that the persons so engaged will cease from that kind of work, or else the owners of the elevators will reduce their charges. This reduction of charges will most surely take place before the owners of the elevators would allow the business to pass out of existence, provided the compensation after such reduction would enable them to realize the average rate of profit for their capital; while, if it would not, it would be conclusive proof that the business of transportation of grain or other commodities where the boats were to be loaded or unloaded by elevators could no longer be conducted with profit to all parties, and some new way would have to be discovered and put in practice, for capital will not seek investment or employment where the average rate of profit cannot be commanded, and men will not continue to transport grain or any other commodity at a loss, or upon such terms that they cannot earn a livelihood. If this is the case in the transportation of grain by the canal, owing to the competition of railroads and their ability to transport it cheaply and rapidly, then that fact must be faced. Such a business cannot be maintained for any length of time, by legislation, at the expense either of capital or of the transporter. Each must earn the average profit in the same general line of business, or the business must, from economical reasons, cease.

The legislation under consideration is not only vicious in its nature, communistic in its tendency, and, in my belief,

wholly inefficient to permanently obtain the result aimed at, but, for the reasons already given, it is an illegal effort to interfere with the lawful privilege of the individual to seek and obtain such compensation as he can for the use of his own property, where he neither asks nor receives from the sovereign power any special right or immunity not given to and possessed by every other citizen, and where he has not devoted his property to any public use, within the meaning of the law.

The orders of the General and Special Terms of the Supreme Court should, therefore, be reversed, and the relators discharged.

Orders in this case affirmed on the opinion in People *v.* Budd. RUGER, Ch. J., ANDREWS, EARL, DANFORTH, and FINCH, JJ., concur.

PECKHAM, J., reads for reversal, in which GRAY, J., concurs.

Orders affirmed.