(16 App. Div. 8.)

## GRANNAN v. WESTCHESTER RACING ASS'N et al.

(Supreme Court, Appellate Division, Second Department. April 13, 1897.)

1. PUBLIC FRANCHISES—RACING ASSOCIATION.
    A racing association organized under a statute authorizing the creation of corporations to conduct horse races for stakes has a quasi public function, and therefore has no right to exclude a person from its meetings merely because he had, on a former occasion, violated a rule against betting.

2. CIVIL RIGHTS—PLACES OF AMUSEMENT—RACE COURSES.
    Horse racing is an amusement, within Laws 1895, c. 1042, providing that all persons shall be entitled to full and equal privileges in all places of public amusement.

3. EQUITY—INADEQUACY OF REMEDY AT LAW.
    A person whose occupation, as a breeder of horses, requires that he should attend the various race courses, is entitled to equitable relief against the action of racing associations by which he is wrongfully excluded from race courses, his remedy at law being inadequate.

Appeal from special term, Westchester county.

Action by Charles R. Grannan against the Westchester Racing Association, the New York Jockey Club, and others, to declare null and void a certain resolution of defendant the Jockey Club, and to enjoin defendants from enforcing said resolution against plaintiff, and from depriving him of any of the privileges enjoyed by the public at the various meetings by the stewards of the Jockey Club. From an order denying a motion to continue pendente lite a temporary injunction theretofore granted, plaintiff appeals. Reversed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and BRADLEY, JJ.

Benjamin F. Tracy, for appellant.
Julien T. Davies, for respondents.

HATCH, J. The defendant the Westchester Racing Association is a corporation organized under chapter 570 of the Laws of 1895, entitled "An act for the incorporation of associations for the improvement of the breed of horses, and to regulate the same: and to establish a state racing commission." The defendant the New York Jockey Club is a corporation organized under chapter 213 of the Laws of 1891, entitled "An act to provide for the formation of corporations for improving the breed of domestic animals." The other defendants are officers of the last-named defendant, called "stewards," and are its governing body. The act under which the Westchester Racing Association was organized required, inter alia, that it shall obtain from the state racing commission, also created by said act, an annual license, before it is authorized to conduct running races, which is the particular character of the racing conducted by said association. This license is required to contain the condition that all running races or race meetings conducted thereunder shall be subject to such reasonable rules and regulations as from time to time shall be prescribed by said Jockey Club. Failure by said corporation to comply with the terms and conditions of the license subjects it to the penalty of having its license re-

voked and annulled by the racing commission. It appears from the papers that the rules of the Jockey Club were intended to apply to all race courses east of the eighty-first meridian line which were recognized by it, and these are termed "recognized courses.". And the complaint avers that all other associations owning and controlling race tracks in this country recognize the rules of the Jockey Club and the action of the stewards thereunder. It thus appears that the Westchester Racing Association, and all other associations of like character, while separate entities, are governed and controlled in their conduct of races by an entirely different body, whose rules furnish the law governing their action in this respect, and which they are bound to obey, under penalty of losing the license, which is their only authority for engaging in the racing business. The Jockey Club, by virtue of its authority to prescribe rules for the conduct of races, and to govern the action and conduct of persons engaged therein, and others, prescribed the following rule:

"150. Jockeys Betting. No jockey shall bet on any race, except through the owner of and on the horse which he rides; and any jockey who shall be proved to the satisfaction of the stewards to have any interest in any race horse, or to have been engaged in any betting transaction, or to have received presents from persons other than the owner, will have his license at once revoked. Any person knowingly acting in the capacity of part owner or trainer of any horse in which a jockey possesses any interest, or making any bet with or on behalf of any jockey, or otherwise aiding or abetting in any breach of the orders of the stewards, will be ruled off."

This is the only rule made by the stewards of the Jockey Club which has any material bearing upon the subject-matter which we are now considering. It is the rule upon which the stewards based the action which will be hereafter considered, and to which effect must be given; otherwise there exists nothing upon which to base their action. Some other rules have been referred to, but they may be dismissed from consideration, as they do not affect the authority upon which the stewards have assumed to act. It is alleged in the complaint that the plaintiff has been for many years interested in race horses; that he has purchased, sold, and owned such horses, and has for many years run them on the various race tracks in the United States, and that he still owns race horses. or interests therein, is a breeder of such horses, and is interested in improving their breed; that in order to carry on his business as a breeder, owner, purchaser, and seller of race horses, it is necessary that he should have free access to the different race tracks during the various meetings, in order that he may there observe the action of the different horses running on said tracks, and it is impossible for him to conduct his business intelligently if he is debarred from obtaining such information in this manner; that at a special meeting of the Jockey Club held on September 28, 1896, the stewards of said club adopted the following resolution:

"It has come to the knowledge of the stewards of the Jockey Club that Fred Taral, jockey, received a present of $500 during the season of 1895, in violation of the rules of racing. Owing to Taral's universally accepted good character, he is reprimanded by the stewards, ordered to refund the money re-

ceived by him in violation of the rules; and all jockeys are warned that the penalty for accepting presents, under rule 150, will be strictly enforced. Resolved, that Riley Grannan be warned and ruled off the turf for offering and making presents to jockeys in violation of the rules of racing."

On the 17th day of October, 1896, plaintiff purchased a ticket at the ticket office of the defendant the Westchester Racing Association, at Morris Park, in the county of Westchester, where it was then conducting a meeting for running races. Such ticket entitled him to enter the race track and enjoy the privileges common to the public generally. Upon presenting such ticket and demanding the right to enter upon the race track, he was denied admission, and was excluded therefrom by the Westchester Racing Association. The plaintiff by this action seeks to have the said resolution of the Jockey Club declared null and void, and to enjoin the defendant the Westchester Racing Association from enforcing the resolution, or from depriving the plaintiff of any of the privileges enjoyed by the public at the various meetings controlled by the stewards of the Jockey Club. A temporary injunction was issued, restraining the enforcement of said resolution, and, upon motion to make said injunction permanent during the pendency and trial of the action, the same was denied and said injunction was vacated. From the order entered upon that decision the plaintiff brings this appeal.

The act under which the Westchester Racing Association is organized provides that no association shall engage in the conduct of races unless it be incorporated in pursuance of the terms of the act. It also provides that not less than five persons shall be associated together before they can become a corporation for such purpose. By its terms, also, all racing or trials of speed between horses or other animals for any bet, stake, or reward, except such as is allowed by the act or by special laws, shall be a public nuisance. There are no existing special laws which authorize horse racing, and the only authority is this act. The condition, therefore, is that no private individual or association of individuals can engage in this business unless at least five associate themselves together and form a corporation for that purpose. It is therefore plain that it is the purpose and policy of the state to control and regulate the business of racing, and to invest the association which shall so engage therein with quasi public functions; the state exercising control and supervision by means of a commission, and in certain respects through other officers of the state. This is the clear legal effect of the provisions of the act, and is also in accordance with its spirit and intent. What circumstances will serve to impress upon private property a public interest is not at all times clear. But, within certain well-defined lines, we may say that property is affected with a public interest, although beyond these limits the right is doubtful, and finally fades away in the imperceptible dividing line. The case, however, is clear enough, as is said by Judge Cooley, "if one is permitted to take upon himself a public employment, with special privileges, which only the state can confer upon him." Cooley, Const. Lim. 736. And the learned author further says that property in business is affected with a public interest "where the business is one the following of which

is not of right, but is permitted by the state as a privilege or franchise." Id. 738. Under this head he groups the case of toll bridges, and other public franchises of like character. As we have before remarked, the franchise enjoyed by the Westchester Racing Association falls within this classification, and in this respect the case is plain, beyond doubt. Indeed, the clear settlement of the right of the public in respect to private property devoted to public use reaches far beyond the limits of the present case. Property essentially private property, used in connection with no franchise derived from the state when devoted to public use, as it affects the public at large, becomes clothed with a public use, which continues so long as the devotion and use are continued. This is the effect of the decision in the Munn Case, 94 U. S. 119, and the decisions of our own courts. People v. Budd, 117 N. Y. 1, 22 N. E. 670, 682. This rule was extended to embrace a skating rink, although concededly the owner of the rink derived no special privilege or protection from the state, and no right existed in the public, in any legal sense, to resort thereto. People v. King, 110 N. Y. 418, 18 N. E. 245. This principle becomes important here, when we shall come to consider the public obligation assumed by the racing association in this case, and the right of individuals composing the public in connection therewith. The distinction which exists between a corporation which is private, and which conducts a private business, and one which receives a special privilege and franchise from the state, is clearly pointed out by Mr. Justice Cullen in People v. Association, 41 Hun, 439. In the case of a private corporation, the only franchise which it obtains is the franchise to be a corporation. But the business which may be carried on by it is not other or different than that which might have been carried on by a partnership or by an individual without the aid of an act of the legislature. In the case of a quasi public corporation, its right to existence and to carry on its business is derived solely from the act which creates it, and does not permit of its being done otherwise. In the present case it would be criminal to do what this corporation does, were it not for the saving grace of the act itself.

The primary purpose and object of this act is to authorize cooperation for the purpose of improving the breed of horses, and regulate it, and for that purpose it creates the state racing commission. The right to breed domestic animals is a right inherent in every citizen, and all may engage therein, without let or hindrance, who choose so to do. The right, however, to race them after they are bred, under circumstances where they may compete for a reward, while existing, with some limitations and restrictions, at common law, and also open to all citizens who chose to engage therein, is by this statute limited. But the right itself is preserved by this act. People v. Fallon, 152 N. Y. 1–12, 46 N. E. 302. Consequently these associations, by virtue of this settled policy of the state, have taken upon themselves a quasi public function, and therefore the public have a right and interest therein which does not attach to a private business conducted by a corporation. This public character places these corporations, as we have seen, in the same category

with bridge, ferry, transportation companies, and others, in which the public has rights firmly secured which may not be denied either to it or to individuals composing it. 2 Mor. Priv. Corp. § 1114, et seq. It is also the averment of the complaint that the defendant the Westchester Racing Association holds at its race track in West-chester county public meetings, at which regular running races are advertised, and to which the general public are invited, and admitted upon payment of the regular entrance fee. So that it appears that not only is the public function impressed upon the association by virtue of the statute, but in recognition thereof, and for its own purposes, it holds itself out as conducting its business for the benefit of the public. Whether it be for the amusement of the public, or its profit, or both, is of little consequence, as the association assumes to do what the policy of the state provided it should do. This being its character, and its conduct fulfilling the public expectation, what are its obligations to the public generally, and to the plaintiff as one of the public? It is not contended against—indeed, it is conceded—that its public obligation requires it to admit all persons to its race meetings who apply for such admission, subject to such reasonable regulations as may be prescribed in pursuance of the authority contained in the act, and which must operate in their application on all citizens alike. The rule in this respect which operates upon other corporations existing and carrying on business by virtue of a franchise granted by the state is exactly analogous. Questions have frequently arisen respecting this mutual obligation in the case of common carriers. The rule requires the carrier to accept for passage, when it has suitable accommodations, all persons against whom no reasonable objection can be urged as to the character or conduct of the person so applying for passage, though the right exists to refuse a passenger whose reputation is so notoriously bad as to furnish reasonable grounds for the belief that he will conduct himself offensively and annoy fellow passengers. Yet, where there is nothing in the appearance or action of the passenger which ought reasonably to lead to the belief that he will be guilty of unbecoming conduct, the carrier will not be justified in refusing such person passage, or in ejecting him from the carriage after transportation has once begun. This rule was applied to a female of bad character who had entered a car set apart for ladies. It was held in that case that, as she conducted herself properly while in the car, she could not be ejected therefrom. Brown v. Railroad Co., 7 Fed. 51. The same rule was applied in Thurston v. Railroad Co., 4 Dill. 321, Fed. Cas. No. 14,019, where it was held that the carrier had the right to exclude a gambler who sought to enter its train for the purpose of plying his vocation, or to eject him therefrom if found engaged in gambling thereon, if he refused to desist therefrom. In the first instance, whether the carrier might reasonably infer that the passenger sought carriage for the purpose of engaging in the unlawful vocation, or to render himself offensive, was held to be a question of fact for the jury. So it has been held by the court of appeals in this state that an intoxicated person had the right to ride in a public conveyance so long as he kept quiet and did not interfere with others or render

himself offensive.    Milliman v. Railroad Co., 66 N. Y. 642;   Putnam v. Railroad Co., 55 N. Y. 108.

The rule to be extracted from these cases is that, while the common carrier may exclude from carriage those persons whom it has reasonable apprehensions to believe will conduct themselves offensively, and annoy other passengers or prey upon them, and also to eject from carriage those who are actually guilty of conducting themselves improperly, it may not refuse carriage to those who demean themselves properly, and who give no evidence which ought reasonably to lead to the belief that they will do so, or eject from carriage any person who conducts himself properly, even though such persons may have a bad character, offensive to public morals, and have been guilty of offenses which exclude them from respectable society.    Hutch. Carr. § 593 et seq.    The right to exclude a person from carriage, in the nature of things, cannot be a continuous right.    There is no presumption that a person will continue to do wrong, or that he will continue to fail in observance of reasonable regulations; and when the person presents himself, demanding his legal rights, the carrier, if it refuses to receive him, does so at the peril of establishing that its refusal was reasonable upon the facts as they existed at the time when the right to exclude was asserted.    And this must be the rule even though carriage had been previously properly refused to the same individual.    It is the absolute right of a carrier to refuse to receive for carriage a fugitive from justice, a person suffering from a contagious disease, or one who refuses to pay his fare, or who is drunk and disorderly.    Yet, when these disabilities are removed, it would not be claimed that a carrier would be justified in refusing to transport such persons.    The right exists in the state to authorize the construction and grant a franchise for the maintenance of a toll bridge or license a ferry. The obligation to the public created thereby requires that all persons who present themselves to pass over the bridge or cross on the ferry, upon compliance with the reasonable rules and regulations imposed by such companies, shall be permitted so to do.    And undoubtedly the right exists to refuse passage to a person who entered thereon for the purpose of destroying the company's property.    If a traveler whittled the bridge while thereon, he could undoubtedly be ejected therefrom.    But he could not forever thereafter be denied passage of the bridge.    If he presented himself free of the instrument with which to whittle, or dispossessed of a desire so to do, he could not be denied his legal right to cross because he had once defaced the bridge.    Otherwise he might never be able to travel in that direction.    Certainly he could not exercise the right which the law secures to him.    In all of these cases the authority exists upon the part of the company to protect itself against present or threatened harm.    It has power presently to deny the right to a person threatening improper conduct, or to eject from the premises one conducting himself improperly.    But no right exists to make such refusal permanent, and to debar forever from a public privilege a person whose only offense is that it was proper once so to do.    The situation is in no sense changed when applied to the present defend-

ants.   The Westchester Racing Association has this special privilege and franchise, which imposes upon it a public obligation.   It conducts running races in pursuance thereof, to which it invites the general public.   By the terms of the act creating it, it is authorized to appoint special policemen,—must in fact appoint five, and may appoint without limit as to number,—who are vested with the same power as are the constables of the town where the track is located. The statute makes it the duty of these policemen to prevent gambling; to preserve order; to eject or arrest all persons who shall be improperly within the grounds, or who shall neglect or refuse to pay the fees or to observe the rules prescribed by the corporation. They are required to prevent all violations of law with reference to poolselling, bookmaking, and other forms of gambling, and to arrest any and all persons violating such rules.   These provisions contemplate that necessity may exist for summary dealing with persons who may come thereon, and abundant provision is made for dealing with them summarily.   The offenses of which a person may be guilty while upon the premises are, in many respects, enumerated, and are of such a character as are ordinarily dealt with by police authority in a summary manner, and the authority created by the act seems to be abundant to meet every emergency of which the case permits.   There would seem to be no more difficulty in preventing plaintiff from giving $500 bills to jockeys, and in ejecting him from the course upon that account, than in preventing him from laying bets and ejecting him upon that account.   The offense for which the plaintiff was excluded from the grounds of the racing association was committed upon a race track, and in the immediate presence of the public, and therefore admitted of its being dealt with at once by the officers charged with the duty of enforcing obedience to the rules.   If it be conceded that the offense would not be likely to be detected by the officers in the exercise of a reasonable degree of vigilance, or that it might be committed in secret and outside the grounds of the association, still it would not suffice to uphold plaintiff's permanent exclusion.   The statement contained in his affidavit is that he was not aware of the existence of the rule, and that he is at the present time willing to abide by the terms of it, and obey all the rules and regulations of the association.   If we assume that he knew of the rule and willfully violated it, still, as we have seen, his present right does not rest upon that fact, but rests upon his right and his willingness to now comply with all reasonable rules and regulations.   And he has the legal right to demand that the condition of his entrance be determined by that fact, and not upon an offense committed prior thereto, except as the latter may fairly be considered as bearing upon his present attitude.   It may be that these matters cannot at all times be determined correctly, or that application of the usual methods will suffice to produce absolute obedience to reasonable regulations at all times.   But, in order to preserve the rights of all, this seems to be the only method which admits of a practical application in the correction of abuses of this character.   The possible conditions which may be created under this statute are illustrative of the necessity of the construction which.

we have indicated, when we consider the somewhat novel position in which plaintiff is placed by this resolution, if it were to be sustained. We have seen that by the act any number of persons not less than five may become a corporation of this character, upon complying with its provisions. No specified sum, as capital stock, seems to be required. But it is requisite that its shares shall not be less than $5 nor more than $100 each. It would be possible, therefore, for plaintiff to associate himself with four other gentlemen and organize a corporation, which could issue 5 shares of stock at $5 a share, and thus, by an investment of $25, secure to himself and his associates the benefits of the act. But, while this might be done, the singular anomaly would present itself, that while he might be corporator and director, and in possession of a license from the state to conduct races, yet the moment his association attempted to conduct a race meeting it would become immediately his duty to eject himself from his race course, through the operation of the rules of the Jockey Club and its action thereunder. And, what is more, he could not return thereto at any time. The absurdity of this condition makes plain the utter futility of upholding the permanent exclusion of plaintiff from the race track of this association.

There is, however, another conclusive answer to the contention of the defendants. By the provisions of chapter 1042, Laws 1895, it is provided that all persons within the jurisdiction of the state shall be entitled to full and equal privileges in all places of public amusement, subject only to the conditions and limitations established by law, and applicable alike to all citizens. It is plain that the racing of horses is in the nature of an amusement. As we have seen, the property and place where such races are conducted have become clothed with a public interest, and the association, by reason of its franchise from the state, is under the public obligation to conduct its business for the benefit of the public, in pursuance of the obligation thereby created to fulfill the purpose of its existence. This implies that its gates shall be open to all citizens, and its property subject to use by all who desire to go thereon, and who comply with its reasonable rules and regulations. The first section of the civil rights act is absolute in its declaration of right, and is not qualified by anything contained in its subsequent sections. Its declaration is that all persons shall be entitled to the privilege, subject only to the conditions and limitations established by law. The second section provides a penalty for denial of any of the provisions of the first section. It does not aim, in any respect, to qualify the declaration contained in the first section. By the law of the land, as we have seen, it is the absolute right of any citizen who conducts himself properly, and who complies with the reasonable rules of the public corporation, to enjoy the benefits secured to him thereby; and it is beyond the power of such an association to provide by any rule for the permanent exclusion of any citizen from such place, or exclude him from participation in its benefits. The argument of the learned counsel for the defendants, that the corporation has the right to exclude by a rule which operates upon all citizens alike, cannot be

sustained, as, if followed out to its logical result, it might be made to operate to the exclusion of all citizens. But, as we have seen, this is beyond the power of the corporation; would be destructive of its public obligation, and defeat the very purpose for which its franchise was granted. We have already considered the law and its limitations. It requires corporations of this character to admit all persons who present themselves in fit condition, demean themselves properly, and who comply with the reasonable rules and regulations. And this question is determined by the condition of the person at the time when he demands the right. The denial of such right to a person so situated becomes, therefore, a violation of this statute. Nor is the penalty attached for a violation of this statute an exclusive remedy. Graham v. Canal Co., 46 Hun, 386; End. Interp. St. § 467. Here the right existed before the adoption of this statute, in consequence of which the right exists to invoke any remedy appropriate. Renwick v. Morris, 7 Hill, 575. And there are no words in this statute which limit the remedy for a violation of it to the specific penalty provided therefor.

A consideration of the record in this case develops some extraordinary features, which it is proper that we should consider. The act under which the racing association obtains its franchise, in explicit terms, prohibits betting. Indeed, upon this subject the rigorous provisions of section 351 of the Penal Code apply. By section 11 of the act we are considering, the trustees are exempted from the operation of chapter 9 of title 10 of the Penal Code, relating to gaming, or of the provisions of any penal statute not contained in said chapter, if they comply with section 9 of the act, by posting in a conspicuous place printed notices or placards, in large and legible type, to the effect that all disorderly conduct, poolselling, bookmaking, or other kind of gambling is prohibited, and also containing a copy of section 351 of the Penal Code, and also if they comply with section 10, which requires the appointment of not less than 5 policemen for the purpose we have heretofore noted. But such exemption does not obtain if such poolselling, bookmaking, or other gambling shall be knowingly permitted by the trustees or directors. Bearing these provisions in mind, we turn to rule 150, upon which the action of the stewards is based in excluding plaintiff from the privileges of the race track, and we discover that it relates to "jockeys betting," is so headed, and in terms provides for certain conditions when he may bet, which are that he must do it through the owner of, and upon, the horse which he rides. All other bets by him are prohibited. He is made liable to forfeit his license if he bets otherwise. The singular anomaly is therefore presented of the governing body of this racing corporation, acting under a statute which prohibits betting and other forms of gambling upon the tracks of the association within its jurisdiction, deliberately making a rule regulating a practice which the law makes a felony if carried on or knowingly permitted by the association upon whose track the jockey rides. But this is not all. In the affidavit of Mr. Keene, one of the stewards of the Jockey Club, and who took part in the proceedings

by which plaintiff was expelled forever from the track of all asso-
ciations within its jurisdiction, we find this most remarkable state-
ment:

"That the plaintiff  *  *  * has been a frequenter of race courses for a
number of years past, and has made a practice of betting heavily upon the
races. The amount of the sums wagered by him, and the publicity attending.
the making of the bets, has become a matter of public comment, and has cre-
ated for him quite a wide notoriety as a 'plunger.' The methods employed by
the plaintiff have upon more than one occasion come to the notice of the Jockey
Club, and during the month of ———, 1896, the matter having again come to·
the attention of the Jockey Club, * * * deponent was deputed to look into·
the matter and endeavor to effect a change in Mr. Grannan's practices. * * *
Deponent made inquiries as to the methods employed by Mr. Grannan, and.
ascertained that by reason of the amounts wagered by the plaintiff, and the
publicity apparently courted, and certainly obtained, by him, and by reason of·
other circumstances, it was very desirable that the plaintiff should make a
radical change in his betting methods. * * * Deponent therefore communi-
cated with the plaintiff, * * * sending a request that the betting methods·
employed by him be modified, and the plaintiff * * * ceased to attend the
races. * * * After about a month's absence, deponent was informed that
the plaintiff had returned and resumed his former methods of betting upon.
the races, whereupon deponent sent to plaintiff a request to change his meth-
ods, but to this request no attention was paid by the plaintiff."

It is therefore quite apparent, both from the rule and this frank.
statement, that the practical sum of plaintiff's offending was that
he bet too heavily, and refused to change or modify his methods of.
betting. We have made this reference to the rule and the evidence·
for two purposes: First. To show that such rule is without force
and is utterly void. Its purpose is plain. It was intended to and
had the effect of regulating an offense against the law, and, if the
means were provided or were knowingly permitted by the association
for such purpose, its officers would be guilty of a felony. It pro-
vided for a matter which it was the duty of the Jockey Club and the·
association to suppress. It was what the association was command-
ed to do by the terms of its franchise. Second. The quoted evidence·
shows that the fact that plaintiff bet was a matter of widespread pub-
lic notoriety; and not alone that, but that this violation of law came·
to the knowledge of the governing body of the association. What
was its duty? Where were the five policemen for which the act stip-
ulated? How long would it take for them to eject the offender from
the place of his offending, or to arrest and convey him to the nearest
magistrate, as the act required, to answer for offended law? Why
was it necessary to make an offense of giving a present to the·
jockey, when the policemen could place the offender beyond the·
possibility of offense in this respect, if committed while upon the
track, and at the same time wipe out the inducing cause, and might·
possibly prevent his getting $500 bills, through unlawful practices,
to give to jockeys. The record does not leave in doubt the fact that
if this association and its governing body apply itself diligently to
the suppression of the unlawful practice of gambling upon its race
track and others within its jurisdiction, instead of unlawfully pro-
viding rules for its regulation by persons subject to its entire con-
trol, it is quite probable that the "turf" will attain, in some degree,
at least, that purity for which the stewards seem so earnestly solicit--

ous. It will certainly be as effective in that direction as was the somewhat plaintive request by the governing body to the plaintiff "that the betting methods employed by him be modified."

Finally, we come to a consideration of the question of right in the plaintiff to equitable relief for the infringement of his rights. It is a settled principle of equitable jurisprudence that equitable relief can be granted where there is inadequacy, incompleteness, or insufficiency of legal remedy applicable to the case in hand. The legal remedy which the party in this case has the ability to invoke is to recover a penalty under the civil rights act, or to bring a common-law action for damages. Neither of these remedies has force or effect upon the rule which has been adopted, by which he is excluded from this race track, and a court would be helpless in such case to grant any relief against it. The plaintiff has a substantial, personal right, coupled in a sense with a property interest, to be allowed to enter upon the premises of the racing association. The right is common to all citizens. The particular interest of the plaintiff is that he is engaged in the breeding of horses, and that such business is promoted by observation of what transpires 'in the business conducted by the Westchester Association. The primary purpose of authorizing the business of the association, as expressed in the title of the act creating it, is to improve the breed of horses. The plaintiff, in the business alleged in the complaint to be carried on by him, is entitled to avail himself of such means of information as will aid him in the business which it is the design of the association to promote. So long as this rule is operative, he may not avail himself of his privileges for any purpose, and no action at law will avail to aid him in this respect. We think, therefore, owing to the peculiar conditions surrounding the case, that equity will intervene to grant relief and obliterate the unlawful obstruction.

It follows from these views that the order appealed from should be reversed, with $10 costs and disbursements, and the motion to continue the injunction granted, with $10 costs, to abide the event of the action. All concur.